IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01275

CROWNALYTICS, LLC, a Colorado Limited Liability Company

Plaintiff,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP, LLC a
Delaware Limited Liability Company; and INFORMATION
RESOURCES, INC., a Delaware Corporation

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

This is an action for damages and injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and other federal and state laws, including the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-101 *et seq.,* arising out of the unlawful and anticompetitive practices of Defendants SPINS, LLC (hereafter, "SPINS"); DAAP, LLC (hereafter, "DAAP"); and Information Resources, Inc. (hereafter, "IRI") (collectively, "Defendants"). In addition, Plaintiff Crownalytics, LLC (hereafter, "Crownalytics") seeks injunctive relief as to its state law claims, as specified below. Crownalytics alleges as follows upon actual knowledge with respect to itself and its own acts and upon information and belief as to all others:

## I.  JURISDICTION AND VENUE

1.        This Court has subject matter jurisdiction over Crownalytics's claims relating to violations of Sections 1 and 2 of the Sherman Act, under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 15. The Court has supplemental jurisdiction over Crownalytics's state law claims pursuant to 28 U.S.C. § 1367(a). Crownalytics's federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution. These actions have affected interstate commerce.

2.        This Court has personal jurisdiction over Defendants because they each transact business in the District of Colorado, are registered with the Colorado Secretary of State, and maintain registered agents for service of process in Colorado. Crownalytics, a Colorado company, is a competitor in the data analytics market and is being injured by Defendants' anticompetitive conduct. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado. Both IRI and SPINS serve Colorado-based customers and over two dozen of Crownalytics's and SPINS's mutual customers reside in Colorado.

3.        Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C.

§ 1391. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado.

## II.  **THE PARTIES**

4.      Plaintiff Crownalytics is a Colorado Limited Liability Company with its principal place of business at 9455 Crystal Lane, Longmont, CO 80503. Crownalytics is a data-agnostic analytics and insights consulting company that provides data analytics services to customers that manufacture and sell natural and organic consumer packaged goods (hereafter, "NOCPG"). NOCPG is an industry-recognized segment in the broader consumer packaged goods marketplace. Crownalytics turns hard-to-use retail sales tracking data purchased by its customers into meaningful and actionable information and insights that assist them in optimizing their sales and marketing strategies. Crownalytics has competed and thrived in this market for years by offering premium service at the lowest prices in the industry.

5.      Kristopher Crown is the owner and founder of Crownalytics and manages its day-to-day operations.

6.      Defendant SPINS is a Delaware Limited Liability Company with its principal place of business at 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. SPINS provides retail tracking data (also called purchase or point-of-sale data) relevant to the NOCPG industry. These are data collected from retail sales channels which customers of SPINS can then purchase a license to access and use. Since 2017, SPINS also provides data analytics services in competition with independent providers. SPINS provides these services both directly and through its subsidiary, DAAP. Since 2021, SPINS has also marketed a data analytics tool called PowerTabs.

7.      Defendant DAAP is a Delaware Limited Liability Company with its principal place of business at the same location as SPINS, 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. Upon information and belief, SPINS owns, at a minimum, a controlling interest in DAAP, and

DAAP may be a wholly owned subsidiary of SPINS. DAAP also provides data analytics services. Upon information and belief, DAAP participated, or was an instrumentality of SPINS, in the planning and execution of the wrongful conduct and conspiracy alleged in this Complaint. (References to "SPINS's data analytics services" refers to analytics services offered by SPINS and/or DAAP.)

8.      Defendant IRI is a Delaware Corporation with its principal place of business at 203 N. LaSalle Street, Suite 1500, Chicago, IL 60601. IRI also provides retail tracking data relevant to NOCPG manufacturers. IRI provides retail tracking data in other market segments as well. As with SPINS, IRI's customers purchase a license to access and use these data. IRI also offers data analytics services in this market directly and through its partnership with its data analytics competitor, SPINS.

### III. <u>NATURE OF THE ACTION</u>

9.      Defendants IRI and SPINS are competitors in the market for the sale of retail tracking data relevant to NOCPG manufacturers (hereafter, the "NOCPG Data Market"). Defendants collect these point-of-sale data from retailers and sell licenses to use it to NOCPG manufacturers. These manufacturer customers purchase the data from companies like IRI and SPINS, and then employ data analytics firms like Crownalytics to analyze the data for them.

10.     In 2014, IRI and SPINS brazenly decided to forgo competition in the NOCPG Data Market and entered an arrangement expressly coordinating and combining their sale of data to NOCPG manufacturers.

11.     Crownalytics provides data analytics services to NOCPG manufacturers. The market for data analytics services provided to manufacturers of NOCPG (hereafter, the "Data Analytics Market") was competitive until Defendants began working in concert to foreclose competition in that market.

12.     Because the NOCPG Data Market is upstream from the Data Analytics Market, the

state of competition—or lack thereof—in the NOCPG Data Market has consequences for that market, and for the Data Analytics Market as well.

13.     SPINS by itself has sufficient market power in the NOCPG Data Market to foreclose competition in the downstream Data Analytics Market. But, as explained further below, a combined venture of IRI and SPINS is even better positioned to do so. At issue here is IRI and SPINS's use of their individual and shared market power in the NOCPG Data Market—in which they are horizontal competitors—to drive out competition from the Data Analytics Market—in which they also are horizontal competitors of each other and Crownalytics.

14.     Under their anticompetitive arrangement in the NOCPG Data Market, SPINS serves as the primary sales channel for IRI's NOCPG data as well as the sole sales channel for its own data. Most significantly, as a result of its arrangement with IRI, SPINS—and only SPINS—also offers a bundle of IRI and SPINS retail tracking data that reflect relevant transactions from various types of NOCPG retail channels (hereafter, the "SPINS Bundle"). The SPINS Bundle cannot be replicated.

15.     To ensure that SPINS is the primary if not sole channel though which NOCPG manufacturers procure IRI's data, the arrangement permits SPINS to offer the IRI data as part of the SPINS Bundle at a deep discount (as much as sixty-six percent) off the price of procuring it directly from IRI.

16.     Of course, the vast majority of customers in the NOCPG Data Market purchase the SPINS Bundle. Over eighty percent of Crownalytics's customers who purchase data in the NOCPG Data Market for use in obtaining data analytics services in the Data Analytics Market purchase the SPINS Bundle. An additional ten percent purchase SPINS data.

17.     Beginning in 2021, SPINS and IRI agreed to and began using their horizontal agreement to exploit their market power in the NOCPG Data Market to foreclose Crownalytics and

others from competing with them in the downstream Data Analytics Market.

18.     To accomplish their anticompetitive scheme, Defendants coordinated to simultaneously alter their prior business practices to: (a) prohibit NOCPG manufacturing customers who purchase Defendants' data in the NOCPG Data Market from dealing with Crownalytics (or others) in the Data Analytics Market; (b) prohibit these same customers from purchasing stand-alone software from Crownalytics to self-analyze Defendants' data; and (c) condition the sale of Defendants' NOCPG data—both the SPINS Bundle and each of their data sets separately—on the manufacturers' agreement either not to use other firms that compete with Defendants in the Data Analytics Market or to purchase Defendants' data analytics services in that market.

19.     This conduct violates Sections 1 and 2 of the Sherman Act as: (a) a group boycott of Crownalytics—a *per se* violation of Section 1 of the Sherman Act; (b) unilateral refusals by each Defendant to deal with rivals, in violation of Section 2 of the Sherman Act; (c) illegal tying in violation of Sections 1 and 2 of the Sherman Act; and (d) a conspiracy to monopolize in violation of Section 2 of the Sherman Act. This conduct also violates the Colorado Antitrust Act.

20.     In furtherance of Defendants' anticompetitive scheme, Defendant SPINS also has tortiously interfered with Crownalytics's contracts and prospective business relations, notifying customers that Crownalytics will not be allowed to perform data analytics services using SPINS data. SPINS representatives have made false and damaging statements about Crownalytics to both Crownalytics's customers and one or more competitors to gain a business advantage while it terminates Crownalytics's access to SPINS data. Moreover, SPINS has marketed and sold SPINS PowerTabs tools and services, in breach of a contract with Crownalytics by which it specifically agreed that SPINS may not use Crownalytics's confidential information and reports as a basis to develop or have a third party develop an Excel-based report substantially similar to Crownalytics data analytics reports. Instead, SPINS used Crownalytics's confidential information and reports to

create SPINS's substantially similar Excel-based PowerTabs tools and services.

### IV. THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

21.     For purposes of analyzing the conduct alleged in this Complaint, there are two relevant product markets: the NOCPG Data Market and the Data Analytics Market. The geographic scope of the two markets is the same.

#### A. The Relevant Product Markets

##### 1. The NOCPG Data Market

22.     In the NOCPG Data Market, three providers collect and sell retail tracking data from various retail channels that are relevant to NOCPG manufacturers. These data are loaded into and stored in databases that the providers maintain. Access to and use of these data are then sold to NOCPG manufacturers. Two companies, Defendants IRI and SPINS, have developed massive databases that are highly relevant to NOCPG customers. SPINS and IRI are competitors in the NOCPG Data Market.

23.     IRI's data include point-of-sale transactions from large grocery chains and retail outlets. SPINS's data is an exclusive collection of point-of-sale transactions from more specialized often smaller or regional natural and organic retailers.

24.     A third data collection company is The Nielsen Company, LLC (Nielsen). Like IRI, Nielsen also collects data from retail channels. Customers in the NOCPG Data Market appear to consider Nielsen's data set a third choice when compared to either SPINS's or IRI's data. It is unclear whether this is because of the relevance of the retailers from whom Nielsen collects data, or because of IRI and SPINS's anticompetitive conduct.

25.     Customers in the NOCPG Data Market are manufacturers of NOCPG. In order to identify and obtain the best advertising, sales channels, and other opportunities necessary to launch and sell NOCPG, these customers look to historic data relating to sales of both their own and other

NOCPG. As noted, these data are collected at the point-of-sale from sales channels ranging from large grocery chains (such as Kroger and Walmart) to more specialized and often regional natural and organic retailers and sales channels.

26.     Both SPINS and IRI offer their data as a standalone product. In 2014, however, they began offering the SPINS Bundle. Customers can purchase the SPINS Bundle from SPINS—and only from SPINS. IRI permits SPINS to sell its data in the SPINS Bundle at a significant discount off the price IRI charges customers for the data. All of the data provided by SPINS in the SPINS Bundle are branded "SPINS"—although on its website and elsewhere SPINS markets the fact that the SPINS Bundle includes IRI data.

27.     Replication of either the SPINS or IRI database, let alone the SPINS Bundle, is virtually impossible due to, among other factors, exclusive contracts and relationships that SPINS and IRI have taken years to establish and cement with retail channels. As SPINS explains on its website, the SPINS Bundle is "the industry's only source of cross-channel visibility across the full market landscape." SPINS goes on to explain why: "through exclusive retail partnerships, SPINS is the only place to access point of sale data from hundreds of leading natural, regional, and specialty retailers where emerging trends are often seen first."[1]

28.     In addition to exclusive agreements, the time and cost of replicating these data sets is prohibitive. In a complaint that IRI filed against Nielsen in 1997 alleging monopolization of the retail tracking data market, IRI described the barriers to entering that market:

> 34. The cost of entering a retail tracking services market, whether using audit-based or scanner-based technology is high. In order to offer its InfoScan service in the United States, for example, IRI had to first create an enormous database of sales and "causel" data measuring consumer purchases at thousands of retail outlets throughout the country. IRI also had to employ hundreds of computer

---

[1]     *See* https://www.spins.com/insights-and-tools-for-brands/ (last visited on May 17, 2022).

> technicians, software engineers, field personnel and client service staff, construct a computer processing facility, and develop complicated computer software systems. IRI then had to develop the expertise to organize, process, and manipulate the vast amounts of scanner data involved in providing a national retail tracking service.
>
> 35. Moreover, before IRI could begin offering a competitive retail tracking service, it had to accumulate at least 12 to 18 months of data for comparative purposes so that clients could measure trends and changes affecting sales of their products. Stated differently, a supplier typically has to collect and process data for a year-and-a-half before it is in a position to be able to generate revenues and compete effectively in a market for retail tracking services.[2]

29.     Indeed, IRI's complaint explains in detail "the high barriers to entry that characterize these markets" (referring to the broader consumer packaged goods marketplace).[3] These include a long history of industry concentration; high costs to enter the market and also to compete in the market after entry, including those related to developing and maintaining proprietary software systems and "unique expertise"; the long period of time—twelve to eighteen months—that data must cover before they can be used to identify trends or changes in marketplace behavior; the costs to collect large amounts of data frequently enough to be useful to customers as well as the costs to store these data and deliver them to customers.[4] According to IRI, "[b]ecause of the high costs associated with providing a retail tracking service, upon information and belief, at a minimum, an efficient supplier must have a share of between 35% and 40% of the United States Market just to break even or achieve a minimum viable scale."[5]

30.     NOCPG manufacturers determine individually which databases include the data

---

[2]     *See Information Resources, Inc. v. The Dun & Bradstreet Corp., et al.*, First Amended Complaint ¶¶ 34-35, a copy of which is attached as **EXHIBIT 1.**
[3]     *Id.* at ¶ 95.
[4]     *Id.* at ¶¶ 123-127.
[5]     *Id.* at ¶ 128.

most relevant to their business plans. The vast majority of customers in the NOCPG Data Market (eighty percent) purchase the SPINS Bundle.

31.     Accordingly, SPINS has market power individually in the NOCPG Data Market, as does IRI by virtue of its partnership with SPINS. Additionally, the two entities together possess shared market power in the NOCPG Data Market.

### 2.   The Data Analytics Market

32.     After purchasing data in the NOCPG Data Market, NOCPG manufacturers must then analyze those data to identify various market attributes that will assist them in optimizing their sales and marketing strategies. The value of the data lies not in the data themselves, but, rather, in the conclusions to be drawn from them through the use of data analytics services. Likewise, there is no value to data analytics services without a data set upon which to perform them. Crownalytics is one provider of these data analytics services and historically has been the most aggressive among the competitors in terms of the price and value of its services.

33.     The Data Analytics Market is the market for the provision of data analytics services to NOCPG manufacturers. The suppliers are experienced third-party data analytics services firms with specific experience in analyzing point-of-sale data—provided by IRI and SPINS and, to a lesser extent, Nielsen. The customers are manufacturers of NOCPG who retain providers of data analytics services to assist them in optimizing their sales and marketing strategies.

34.     Certain NOCPG manufacturer customers—typically, those that are larger and more sophisticated—may perform some data analysis themselves, using "in-house" professionals. Most of these customers, however, still purchase data analytics services from third parties to supplement their internal data analytics. Other customers in the NOCPG marketplace rely entirely on a third-party data analytics services provider (like Crownalytics) to analyze the NOCPG data. This eliminates customers' costs associated with hiring and retaining in-house data analytics experts and

the investment necessary to stay current with analytics tools and expertise.

35.    These NOCPG manufacturers that purchase analytics services in the Data Analytics Market are all customers in the NOCPG Data Market.

36.    Third-party data analytics providers are largely database agnostic, analyzing whatever data their customers provide to them, regardless of its source. Indeed, one reason a customer purchases third-party data analytics services is to harmonize data obtained from multiple sources.

37.    While both IRI and SPINS also offer data analytics services to NOCPG manufacturers (and in part because of that), they have always understood that their customers retain third-party data analytics firms to analyze the data that IRI and SPINS sell to them. IRI and SPINS are also aware of the identities of these data analytics services providers. In fact, on various occasions, SPINS has sent emails thanking Crownalytics for promoting SPINS's database to new and existing mutual customers—of SPINS in the NOCPG Data Market and of Crownalytics in the Data Analytics Market.

38.    Crownalytics entered the Data Analytics Market in 2016. By 2020, prior to IRI and SPINS's anticompetitive conduct described in this Complaint, there existed at least four independent competitors—in addition to SPINS and IRI—in the Data Analytics Market. These included Crownalytics, TABS Analytics, Red Fox Analytics, LLC (hereafter, "Red Fox"), and Bedrock Analytics (hereafter, "Bedrock").

39.    While IRI provides some data analytics services directly, it appears to have ceded at least some portion of that business to its competitor SPINS. Before IRI and SPINS undertook their anticompetitive scheme, Bedrock and Crownalytics served the majority of the Data Analytics Market.

40.    Although other entities provide data analytics services to other types of

manufacturing customers, those suppliers are outside of the Data Analytics Market because they lack the requisite reputation and experience in the NOCPG space within the consumer-packaged goods industry to be able to compete effectively with data analytics services providers like Crownalytics, who have catered primarily to customers in this space for years. But even were these potential entrants inclined to enter this market, Defendants' conduct has erected barriers to competition by *any* unaffiliated data analytics firm, whether a prior incumbent or new entrant. Defendants' conduct precludes current and potential competitors equally.

## B.  The Relevant Geographic Markets

41.     The relevant geographic scope of both the NOCPG Data Market and the Data Analytics Market is national.

42.     Because of differences between countries in consumer demand, language, currency, customer, brand names, bar codes, and advertising, among others, the NOCPG Data Market is national in coverage.

43.     Because data analytics services are designed to factor in and assess these same country-specific variables, the Data Analytics Market also is national.

44.     While a supplier of either service could be located anywhere in the world, expanding the relevant geographic market to global has no impact on this case or allegations. An international data provider would still need access to relevant US retail tracking data and would encounter the same barriers discussed herein as a company based in the United States. Similarly, an international provider of analytics services would be just as foreclosed from entering the data analytics market by Defendants' anticompetitive conduct as a US-based provider.

## V. GENERAL ALLEGATIONS

## A.  Crownalytics's Relationship with SPINS and IRI

45.     When Crownalytics began providing data analytics services in 2016, its customers

provided it access to the data that they had purchased from SPINS, IRI, and Nielsen for Crownalytics to analyze.

46.     SPINS was fully aware that Crownalytics was providing these data analytics services to their mutual customers. Indeed, SPINS facilitated this arrangement by providing Crownalytics with access credentials for its databases so that Crownalytics could directly access the data that their mutual customers had purchased.

47.     Likewise, IRI also understood that Crownalytics provided data analytics services to their mutual customers and, in doing so, worked with the data that those customers had purchased from IRI. As recently as January 2021, IRI provided access credentials for its database.

48.     In some cases, SPINS and IRI entered into third-party user agreements (hereafter, "TPAs") with the customers that specifically authorized the customer's chosen third-party data analytics services provider—often, Crownalytics—to have access to the data that customers purchased from SPINS or IRI so that the data analytics services providers could serve those customers. The TPAs provided Crownalytics with access credentials to SPINS and IRI's respective databases, or to the SPINS Bundle. In all cases, Crownalytics cooperated in these arrangements.

49.     Indeed, Crownalytics and SPINS had an extremely collaborative relationship. For example, in an email to Crownalytics dated September 2, 2020, SPINS representative Anubhav Goel said "Hope this note finds you and yours doing well. I heard you're building a strong partnership with Brent Grube, one of our newest Sales leaders also based in the Denver area. He's quickly becoming a big fan of yours." Similarly, Crownalytics and IRI worked well together to serve their mutual customers.

50.     In February 2021, SPINS's representative John Pavlenkov notified Crownalytics of SPINS's new plans to formalize the processes whereby a third-party analytics provider could access the SPINS data their mutual customer had purchased. Mr. Pavlenkov wrote: "As one of our most

utilized third parties, we appreciate your help and support." Mr. Pavlenkov described the new procedure as follows:

> 1. **Third Party Agreements**: Brands request that we approve a "third party agreement" for any data usage by a third party. These agreements are sent to me for approval and consideration. We are moving forward in 2021 with no-fee TPA's. Getting a third party approved to use our data costs the client nothing.
>
> 2. **Data Access**: Data access is a paid-for service generally by the brand client. If they want a third party to access their data, they need to pay the user ID and licensing costs for that 3rd party user just as they would one of their own employees. Options include:
>
> 3. **A Third Party Satori License**: Grants access to MYEXTRACTS[6] even if the client does not have their own access. Cost to the client is $5,000 per year for 1 3rd party ID and subsequent access.
>
> 4. **Data Feed**: Our [] team can extract the data and send a data feed. Price varies based on size and complexity of the feed, but it is a generally more expensive option than (a).

51.     While SPINS's new approach would impose some additional cost on its manufacturer customers, Crownalytics believed that, given its own aggressive pricing, most of its customers would accept the $5,000 third-party license fee. Accordingly, Crownalytics did not object to the new procedures or charges. But there was more to come.

**B. Then, Things Started to Change**

52.     In mid-2021, both IRI and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases.

53.     In April 2021, Mr. Pavlenkov introduced Mr. Crown to Edricco Reina, who he explained would be responsible for managing SPINS's relationship with Crownalytics going

---

6       Satori is SPINS's name for its database. Work in Satori can be saved into a folder called "MYEXTRACTS." These are not the inferior static data extracts that SPINS offered to Crownalytics's customers after discontinuing Crownalytics's access to Satori which are described in detail below.

forward. When Mr. Crown met with Mr. Reina, Mr. Reina informed Mr. Crown that SPINS was working on yet another new partnership model for independent data analytics services providers. He did not provide any other details at that time.

54.     Three weeks later, while Mr. Crown was waiting for SPINS's Mr. Reina to provide those details, Crownalytics heard from IRI.

55.     On May 5, 2021, Crownalytics received a cease-and-desist letter from IRI (hereafter, the "Cease & Desist") demanding that Crownalytics immediately discontinue all use of IRI's data—which their mutual customers had purchased—and destroy all copies of those data, including any work product developed through their use. This letter arrived without any warning or preceding discussion and took Crownalytics (and its customers) entirely by surprise.

56.     Crownalytics responded to the Cease & Desist, informing IRI that it had not engaged in any of the wrongdoing alleged in that letter (indeed, had not engaged in any wrongdoing at all). Crownalytics nevertheless agreed to take the steps requested by IRI to discontinue use of the data which their mutual customers had purchased from IRI. Crownalytics complied with IRI's demands, despite the significant cost to Crownalytics of doing so, in the hope of preserving the possibility of resolving this sudden, inexplicable, and seemingly fabricated, conflict.

57.     A month later, in June 2021, while Crownalytics and IRI continued to communicate in connection with the Cease & Desist, Mr. Crown received an email from SPINS's Mr. Reina, indicating that he now was prepared to discuss the new partnership model to which he had referred in April. Perhaps recognizing that IRI and SPINS's coordinated and simultaneous cessation of business relationships and practices that had been in place for years might be a bit obvious, SPINS took a different tack from IRI. SPINS labeled its cease-and-desist demand a new partnership model.

58.     The new model that Mr. Reina revealed was anything but a partnership. To the contrary, SPINS was taking the same action as IRI. Like IRI, going forward, SPINS would prohibit

14

third-party data analytics services providers entirely from accessing SPINS's database in conjunction with those providers' analysis of data that their customers had procured from SPINS.

59.   During a subsequent call on July 1, 2021, Mr. Reina explained to Mr. Crown that, going forward, customers purchasing data from SPINS for analysis by independent data analytics services providers would only be permitted to purchase static "extracts" of those data to share with their chosen data analytics provider. Not only would these new extracts include inferior data, they would be priced so as to significantly increase the cost to a manufacturer customer of using a competing analytics company.

60.   Under SPINS's new "partnership" plan, NOCPG manufacturers would now only be permitted to provide their retained independent data analytics services providers incomplete, static extracts of data purchased from SPINS, rather than providing the complete access upon which the Data Analytics Market was premised. These extracts' inferiority to the data previously available renders the output of the analyses of the extracts correspondingly inferior.

61.   Indeed, the extracts available to non-SPINS data analytics providers are virtually useless for purposes of the services that Crownalytics (and other data analytics services providers) performs. The extracts' limited utility precludes data analytics services providers from generating the type of reporting their customers need and indeed defeats the purpose for which customers hire a third-party data analytics services provider like Crownalytics—which was exactly the effect Defendants intended.

62.   Further, NOCPG customers would now have to pay $5,000 for each extract, in addition to the costs they already incurred to purchase data from SPINS. Given that a NOCPG manufacturer could require from four to twenty extracts, under SPINS's new partnership plan, the manufacturer customers are now looking at what can fairly be characterized as a $20,000 to $100,000 tax on substantially inferior data and, consequently, substantially inferior data analytics

outputs. To place the magnitude of this tax in perspective, Crownalytics's average annual charges for its data analytics services were $20,000, demonstrating the sham nature of this nonviable alternative offering.[7]

63.     Of course, these new restrictions also threatened to diminish the value and utility of the SPINS and IRI data offerings—but they had a solution to that.

64.     If a NOCPG customer wants its data analytics firm to continue to have full access to the data the customer purchased, all the customer has to do is switch to SPINS as its data analytics services provider.

65.     Now, only customers who agree to use SPINS's data analytics services—as opposed to those of a third party—could avoid this degradation in data access and increase in data analysis cost. This is true regardless of whether the customer purchases SPINS data alone, or the SPINS Bundle.

66.     Although SPINS and IRI had offered data analytics services prior to IRI's Cease & Desist and SPINS's new anticompetitive "partnership plan," in that previously competitive market environment, neither had ever gained a significant share of the Data Analytics Market.

67.     As if the impact and effect of SPINS's new "partnership" model were not obvious enough, Mr. Reina explained them to Crownalytics: Because SPINS's data analytics services business had exclusive access to SPINS's complete database (which also meant exclusive access to IRI's data in the case of customers who purchased the SPINS Bundle), third-party data analytics services providers would not survive. More specifically, Mr. Reina stated that he "did not know

---

[7]     Additionally, SPINS now precludes data analytics providers from harmonizing SPINS's data with data Crownalytics's customers may have purchased from Nielsen (or another competitor's data). While this restriction appears targeted at Nielsen, it also undermines the value of independent analytics providers and the value of the analysis NOCPG customers will receive from Defendants. Previously, NOCPG customers have benefited from data harmonization because the analyses used all the data available to the customer.

how they would exist in the future."

**C.** **The Anticompetitive Consequences for Crownalytics and Others in the Data Analytics Market**

68.     While SPINS's anticompetitive "partnership" plan was not yet fully in effect, SPINS immediately commenced using it as the anticompetitive weapon it was. SPINS began actively sharing the new plan with manufacturer customers as well as advising them of the impact this new plan would have on the continuing viability of Crownalytics (and other independent analytics providers) as well as the manufacturer customers' use thereof. Among the actions taken by SPINS in the past months:

- In November 2021, Crownalytics's remaining customers began reporting that SPINS was telling them that Crownalytics is not authorized to access any SPINS data, even though SPINS's new anticompetitive partnership plan will not be fully effective until May 31, 2022.

- Customers also reported that SPINS was falsely disparaging Crownalytics and recommending an alternative data analytics provider, Red Fox, in the event they did not wish to use SPINS. (Red Fox, previously one of the smaller independent data analytics services providers, appears to have reached an undisclosed deal with SPINS and IRI. Even assuming that Red Fox did not simply join IRI and SPINS's conspiracy, Red Fox's agreement with SPINS neutralizes Red Fox's ability and incentive to act as a bona fide independent competitor—disciplining either pricing or quality—of IRI or SPINS in the Data Analytics Market. Red Fox will not be stepping into the low-cost, high-quality maverick role from which Crownalytics was being driven out.)

69.     As expected, Crownalytics's customers began to complain about SPINS's new pricing and data restrictions almost immediately. At this stage, some customers had already been

coerced to leave Crownalytics. Potential new customers opted not to reach out to Crownalytics in the first place.

70.     In a desperate attempt to salvage its business in the face of this bald abuse of market power, Crownalytics began to offer customers self-service software tools that did not require Crownalytics to access any data. Rather, the customers would purchase the software, enter their data, and analyze the data without Crownalytics's involvement.

71.     Offering this software which permitted customers to replicate at least some of the core aspects of Crownalytics's services addressed the concerns of some customers, many others simply stopped working with Crownalytics. Even the limited reprieve bought by the software offering, however, was short-lived. In a coup de grace, and again without even a colorable excuse, SPINS began advising its customers in the NOCPG Data Market that they are prohibited from using Crownalytics's self-service software to analyze the data they had purchased from SPINS.

72.     On April 5, 2022, Crownalytics received an official Notice of Termination from SPINS, formalizing and completing SPINS's exclusion of Crownalytics from the marketplace in a manner identical to what IRI had done. This notice terminated any still-existing TPAs between SPINS and its customers that permitted Crownalytics to access SPINS's data for the purpose of providing data analytics services to those customers—effective May 31, 2022.

73.     Immediately after sending the Notice of Termination, SPINS informed Crownalytics's current, past, and potential customers that, "as of June 1, 2022, Crownalytics will no longer have access to any data from SPINS…. If you use Crownalytics with SPINS data, you will need to obtain a new analytics solution."

74.     After receiving the notice from SPINS, many of Crownalytics remaining customers indicated to Crownalytics that they had no choice but to terminate their agreements with Crownalytics because Crownalytics was no longer able to provide the same valuable data analytics

services that had previously satisfied its customers. While these customers expressed their disappointment in this development, as they preferred to use Crownalytics, they also expressed that they now had no real choice other than to switch to SPINS's or DAAP's analytics services.

## VI. <u>HARM TO COMPETITION</u>

75.     Since Defendants' coordinated conduct began, Crownalytics has received numerous notices from its customers indicating that they had no choice but to surrender their data analytics services needs to SPINS.

76.     Aside from being coerced to use a data analytics services provider not of their choosing, customers also expressed dissatisfaction to Crownalytics that the prices that SPINS had begun to charge for data analytics services are much higher than Crownalytics's prices were. Additionally, the quality of their analytics services, as well as their relationship management and customer support, are inadequate.

77.     Defendants have wielded their market power in the NOCPG Data Market to limit customers' choices in the Data Analytics Market to only one: SPINS. In other words, Defendants can, and do, now force NOCPG manufacturers to purchase their captive data analytics services as a condition of purchasing access to their essential databases.

78.     Absent Defendants' coercive conduct in the NOCPG Data Market, customers would otherwise have contracted with other data analytics services providers in the Data Analytics Market, such as Crownalytics. This is true for many reasons, including that these other data analytics services providers have historically offered superior services at better prices than Defendants now offer. As noted, prior to the new SPINS "partnership" plan, SPINS's analytics offerings never managed to capture a significant share of the Data Analytics Market in the five years of its existence.

79.     Defendants' actions, collectively and individually, have lessened competition in the

Data Analytics Market by limiting consumer choice, increasing prices of the affected services and offerings, and reducing the quality of those outputs. Prior to the complained-of conduct, there were four independent Data Analytics providers, in addition to SPINS and IRI, from whom customers could choose—and benefit from the competition on pricing and service quality. Now, Defendants' actions have led to exit from, and consolidation within, the Data Analytics Market leaving customers with only Defendants as their choices for data analytics services.

80.     Defendants' actions, collectively and individually, have lessened competition in the Data Analytics Market by reducing quality of output by eliminating even the possibility of competitive pressure from competing providers of data analytics services (to the extent that any non-captive data analytics services firms choose to remain in the market). Because those would-be competitors' customers are forced to use inferior data to obtain their services, the utility and quality of any data analytics output will be significantly degraded. Accordingly, the overall quality of the data analytics services provided in the Data Analytics Market is diminished because the analysis depends on access to robust data.

81.     Defendants' actions, collectively and individually, have also lessened competition in the Data Analytics Market by removing any price constraints that previously resulted from the existence of independent competition with a meaningful market share. Crownalytics acquired its position in this market by offering high-quality service at low prices. To the extent that any competition can remain in the face of SPINS and IRI's anticompetitive actions, these competitors will be offering a substantively inferior, higher-priced data analytics services solution. They will be unable to prevent Defendants from imposing supracompetitive pricing because Defendants know that their customers cannot switch to a substitute.

82.     Moreover, Defendants' actions have erected an effective barrier to new entry into the Data Analytics Market because no potential entrant would have the necessary access to

Defendants' data sets or be able to independently replicate them (which would require entry into the NOCPG Data Market, which Defendants have also impeded), and access to these data sets is essential to entering and competing in the Data Analytics Market.

## VII. PLAINTIFF'S ANTITRUST INJURY AND STANDING

83.     As explained above, Defendants' anticompetitive and unlawful conduct has reduced competition in the Data Analytics Market by eliminating consumer choice, so that the market is limited only to Defendants' own captive data analytics offerings.

84.     Defendants' anticompetitive and unlawful conduct has harmed competition in the Data Analytics Market by reducing quality (and stifling innovation) insofar as Crownalytics, which offers a superior, differentiated product, is no longer able to offer its product to customers in the Data Analytics Market. Moreover, Defendants' conduct reduces the incentive to innovate in the Data Analytics Market due to Defendants' absolute foreclosure of competition in this market.

85.     Since Defendants have effectively excluded all competitors in the Data Analytics Market, there is no remaining supplier who can restrain SPINS from further increasing its prices.[8]

86.     There is no procompetitive justification for the behavior alleged above, all of which unreasonably restrained trade and decreased competition in the Data Analytics Market. To the extent that any procompetitive business objectives exist, any such objectives could have been achieved by less restrictive means than eliminating all competition.

87.     The same anticompetitive and unlawful conduct described above that has caused this harm to competition in the Data Analytics Market, has harmed Crownalytics's business. As a direct result of Defendants' unlawful acts, Crownalytics has lost customers, will lose its remaining

---

[8]     Because of its relationship with SPINS, Red Fox no longer provides any competitive restraint. Presumably, Defendants' conduct will stifle all other remaining competitors shortly, to the extent it has not already done so.

customers, and is effectively precluded from capturing new customers. When the final restraints on Crownalytics's access to data become effective, on June 1, 2022, Crownalytics will be completely excluded from the marketplace. This harm confers antitrust standing upon Crownalytics to rectify the antitrust injury that Defendants have caused.

## FIRST CLAIM FOR RELIEF
### (Group Boycott – *Per Se* Violation of Sherman Act, 15 U.S.C. § 1 – by All Defendants)

88.     Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.     Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market. Individually, and together, they also are competing suppliers in the Data Analytics Market where they also compete with Crownalytics, among others.

90.     No other entity collects the NOCPG purchase data that SPINS obtains from smaller or regional retailers. Nor could another company replicate that database or create a viable substitute due to a combination of entry barriers including cost, timing, and existing exclusive arrangements. By virtue of this unique product offering, SPINS has market power in the NOCPG Data Market.

91.     Because IRI and SPINS have combined their competitive offerings into the SPINS Bundle, IRI benefits from SPINS's market power, and SPINS benefits from the incremental increase in market power driven by the SPINS Bundle.

92.     Both SPINS and IRI compete against Crownalytics (and other independent data analytics services providers) in the Data Analytics Market—both individually and as part of their anticompetitive arrangement.

93.     To provide data analytics services and thereby compete in the Data Analytics Market, providers such as Crownalytics must have access to the data their customers purchase in the NOCPG Data Market. Having previously made their data sets available to all providers in the

Data Analytics Market, IRI and SPINS now supply their data sets only in conjunction with their own data analytics offerings.

94.     IRI and SPINS began withholding Crownalytics's (and other competitors') access to their data, in a departure from past practices that had been mutually beneficial to IRI and SPINS and data analytics providers, including to Crownalytics, suddenly and contemporaneously. They did so pursuant to an agreement to use their shared market power in the NOCPG Data Market to eliminate competition in the Data Analytics Market.

95.     IRI and SPINS make no effort to conceal their anticompetitive conspiracy—in fact they advertise it. IRI and SPINS advertise that they have bundled their previously-competing data products and are coordinating their previously competing data analytics offerings. Regardless of the legality of those arrangements, they can hardly now plausibly claim that a major decision impacting the value of that very data bundle as well as their analytics offerings businesses was anything but an agreement to destroy competition from competing independent analytics companies.

96.     Consistent with these admissions, both companies—within weeks of each other—terminated business practices involving complex interdependent relationships with Crownalytics (and others) that had been in place for years and upon which the entire Data Analytics Market depends. Deciding to cut off its customers' access to independent analytics providers that served the majority of the Data Analytics Market customers is not something that can be done on a whim, given the symbiotic relationship between providers in the NOCPG Data Market and the Data Analytics Market—the services of either one being worth less without the other's.

97.     Because access to SPINS and IRI's data is necessary to be able to provide data analytics services, Defendants' denying Crownalytics access to their respective data sets prevents Crownalytics from being able to compete in the Data Analytics Market. Moreover, this prevents

customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

98.    Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

99.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices for consumers—in particular, the elimination of customers' ability to choose a low-cost provider of higher-quality services in the Data Analytics Market.

100.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this Complaint.

101.    There is no reason that is not pretextual why either IRI or SPINS would seek to exclude Crownalytics and other competitors from the Data Analytics Market other than the desire to serve that market unrestrained by competition.

102.    Indeed, barring Crownalytics from being able to compete in the Data Analytics Market is the only reason IRI or SPINS would preclude Crownalytics's access to their data. And IRI and SPINS agreed to do so exclusively for this purpose.

103.    Even if there were another purpose, one that was legitimate and procompetitive, animating IRI and SPINS's agreement, that purpose could have been achieved through less restrictive means.

104.    Because Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market who share market power in that market (and also horizontal competitors of each other and

Crownalytics in the Data Analytics Market), their conspiracy is *per se* illegal under the Sherman Act.

105.   Alternatively, Defendants' conduct is unlawful under an inherently suspect, quick-look, or rule-of-reason analysis because the anticompetitive effects substantially outweigh any legitimate procompetitive benefits of their agreement.

106.   Defendants have thus violated Section 1 of the Sherman Act.

107.   As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Unilateral Refusal to Deal – Violation of Sherman Act, 15 U.S.C. § 2 – by SPINS)**

108.   Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109.   Prior to SPINS's decision to cut off Crownalytics, SPINS and Crownalytics had a longstanding course of dealing that was profitable to both. Indeed, by providing data analytics services to their mutual customers, Crownalytics increased the value of the data that SPINS sold to those customers.

110.   Discontinuing Crownalytics's access to SPINS's data precluded SPINS's customers from being able to obtain data analytics services from Crownalytics and, to the extent that Crownalytics was those customers' preferred data analytics services provider, eliminated any value of the data that SPINS sold to those customers.

111.   There is no rational reason why SPINS would eviscerate the value of its own product to this customer segment in the NOCPG Data Market other than to be able to eliminate competition in the Data Analytics Market in which SPINS also competes.

112.   SPINS had previously made its data available to Crownalytics and nothing had

changed to make it more difficult to do so, or otherwise reduce the incentive for SPINS to do so.

113.    Without being able to share these data with Crownalytics, customers cannot retain Crownalytics to provide data analytics services in the Data Analytics Market. Simply put, Crownalytics must have access to SPINS's data in order to be able to compete in the Data Analytics Market.

114.    Moreover, there is no alternative source from which to obtain SPINS's data set, nor does any comparable substitute exist. It is not practical, or even possible, for Crownalytics to create its own competing data set. Accordingly, SPINS has market power in the NOCPG Data Market.

115.    SPINS's anticompetitive conduct affects interstate commerce in the Data Analytics Market because SPINS, directly and indirectly, uses the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

116.    Crownalytics has suffered injury as a direct result of SPINS's competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

117.    Crownalytics's business reputation and customer relationships have also been damaged by SPINS's actions as described throughout this Complaint.

118.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

119.    SPINS has thus violated Section 2 of the Sherman Act.

120.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Unilateral Refusal to Deal – Violation of Sherman Act, 15 U.S.C. § 2 – by IRI)

121.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

122.    Prior to IRI's decision to cut off Crownalytics, IRI and Crownalytics had a longstanding course of dealing that was profitable to both. Indeed, by providing data analytics services to their mutual customers, Crownalytics increased the value of the data that IRI sold to those customers.

123.    Discontinuing Crownalytics's access to IRI's data precluded IRI's customers from being able to obtain data analytics services from Crownalytics and, to the extent that Crownalytics was those customers' preferred data analytics services provider, eliminated any value of the data that IRI sold to those customers.

124.    There is no rational reason why IRI would eviscerate the value of its own product to this customer segment in the NOCPG Data Market other than to be able to eliminate competition in the Data Analytics Market.

125.    IRI had previously made its data available to Crownalytics and nothing had changed to make it more difficult to do so, or otherwise reduce the incentive for IRI to do so.

126.    Without being able to share these data with Crownalytics, customers cannot retain Crownalytics to provide data analytics services in the Data Analytics Market. Simply put, Crownalytics must have access to IRI's data in order to be able to compete in the Data Analytics Market.

127.    Moreover, there is no alternative source from which to obtain IRI's data set, nor does any comparable substitute exist. It is not practical, or even possible, for Crownalytics to create its own competing data set. Accordingly, IRI has market power in the NOCPG Data Market.

128.    IRI's anticompetitive conduct affects interstate commerce in the Data Analytics Market because IRI, directly and indirectly, uses the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

129.    Crownalytics has suffered injury as a direct result of IRI's competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

130.    Crownalytics's business reputation and customer relationships have also been damaged by IRI's actions as described throughout this Complaint.

131.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

132.    IRI has thus violated Section 2 of the Sherman Act.

133.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Tying – Violation of Sherman Act, 15 U.S.C. §§ 1, 2 – by All Defendants)**

134.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135.    Defendants IRI and SPINS collect retail tracking data, which they sell to customers—manufacturers of branded NOCPG—in the NOCPG Data Market.

136.    Crownalytics, Defendants SPINS and IRI, and others (at least prior to Defendants' anticompetitive conduct) provide data analytics services to those same customers in the Data Analytics Market.

137.   The NOCPG Data Market and the Data Analytics Market are separate markets involving separate products and services. NOCPG manufacturers want—and historically had—the freedom to buy those separate products and services from different suppliers.

138.   SPINS and IRI agreed with each other only to sell their data in the NOCPG Data Market to customers who also retained SPINS to provide data analytics services in the Data Analytics Market.

139.   Defendants coerced customers into contracts that contain *de facto* provisions which operate as negative tying arrangements by conditioning the purchase and use of data on an agreement not to purchase or use the services of Crownalytics (and other competitors in the Data Analytics Market). More specifically, Defendants have sent cease and desist letters telling customers that they cannot provide access to third parties such as Crownalytics, except in the limited, pretextual manner described above. If NOCPG manufacturers desire data analytics services, they now must turn to SPINS.

140.   By virtue of their necessary and irreplicable data sets, as well as their large market shares, IRI and SPINS have market power in the NOCPG Data Market.

141.   The NOCPG Data Market has high barriers to entry. Not only would entry require a major capital investment, it also would require real-time and ongoing access to retail data for which Defendants have exclusive contracts. There are no realistic alternatives to which NOCPG manufacturers can turn.

142.   Defendants are able to impose these tying arrangements on customers because they have market power in the NOCPG Data Market and are assured that they will not face new entry, nor will any other circumstance reduce their market power in the foreseeable future.

143.   The negative tie affects a substantial volume of interstate commerce in the Data Analytics Market by restricting Crownalytics and other rivals from competing in the market.

Specifically, Defendants' anticompetitive conduct affects interstate commerce because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

144.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

145.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this Complaint.

146.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

147.    Defendants have thus violated Sections 1 and 2 of the Sherman Act.

148.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

**(Conspiracy to Monopolize – Violation of Sherman Act, 15 U.S.C. § 2 – All Defendants)**

149.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

150.    Defendants IRI and SPINS are horizontal competitors in both relevant markets: the NOCPG Data Market and the Data Analytics Market. Through their partnership in the NOCPG Data Market, Defendants derived the opportunity to conspire to monopolize the Data Analytics Market.

151.    Because IRI and SPINS have combined their competitive offerings in the Data Collection Market into the SPINS bundle, IRI benefits from SPINS's market power, and SPINS benefits from the incremental increase in market power driven by the SPINS bundle. But those benefits were not enough for Defendants. SPINS and IRI saw the opportunity to eliminate all competition in the Data Analytics Market.

152.    Defendants agreed to bar Crownalytics and other rivals from accessing their data for the sole purpose of monopolizing the Data Analytics Market.

153.    As discussed above, Defendants terminated business practices and complex interdependent relationships with Crownalytics (and others) that had been in place for years and upon which the entire Data Analytics Market depends.

154.    Because access to SPINS and IRI's data is necessary to the provision of data analytics services, Defendants' denying Crownalytics access to their respective data sets prevents Crownalytics from being able to compete in the Data Analytics Market. Moreover, this prevents customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

155.    Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

156.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

157.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

158.    Defendants have thus violated Section 2 of the Sherman Act.

159.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
**(Group Boycott and Concerted Refusal to Deal -- Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 Against All Defendants)**

160.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

161.    As alleged herein, Defendants' group boycott and concerted refusal to deal constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

162.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
**(Unilateral Refusals to Deal – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-105 Against SPINS and IRI)**

163.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

164.    SPINS and IRI's unilateral refusals to deal, as alleged herein, constitute illegal monopolization in violation of Colo. Rev. Stat. § 6-4-105.

165.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
**(Tying – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 et seq Against All Defendants)**

166.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if

fully set forth herein.

167.    Defendants' tying arrangements, as alleged herein, constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

168.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
**(Tortious Interference with Existing and Prospective Business Relations Against SPINS)**

169.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

170.    Crownalytics must have access to SPINS Data to provide its Data Analytics Services.

171.    SPINS has informed Crownalytics's current, past, and potential NOCPG Data Analytics customers that "as of June 1, 2022, Crownalytics will no longer have access to any data from SPINS, either directly, or through customer third party agreements. If you use Crownalytics with SPINS data, you will need to obtain a new analytics solution."

172.    SPINS has announced that it is cancelling all existing TPAs) between SPINS, Crownalytics's Data Analytics customers, and Crownalytics, effective May 31, 2022.

173.    Thus, as of June 1, 2022, Crownalytics will be prohibited by SPINS from providing existing and prospective NOCPG customers its Data Analytics services using SPINS Data, including the SPINS Bundle.

174.    SPINS representatives have made false and damaging statements about Crownalytics to both Crownalytics's customers and one or more competitors, to gain a business advantage while it terminates Crownalytics's access to SPINS data.

175.     SPINS has intentionally and improperly interfered with Crownalytics's existing and prospective contractual relations with NOCPG customers for the provision of Data Analytics services.

176.     SPINS has intentionally and improperly prevented Crownalytics's existing and prospective NOCPG customers from acquiring or continuing contractual relations with Crownalytics for the provision of Data Analytics services.

177.     As a result of the foregoing, Crownalytics has been injured and will be injured.

178.     Crownalytics has already lost customers, contracts, goodwill, and its competitive market position as a result of the foregoing.

179.     As a result of the foregoing, Crownalytics will be irreparably harmed by being forced out of the Data Analytics business, losing customers, losing contracts, goodwill, and its competitive market advantage.

180.     Crownalytics is entitled to injunctive relief to prevent the loss of existing and prospective NOCPG Data Analytics customers, contracts, goodwill, and competitive market position and to prevent it from being forced out of the Data Analytics business.

181.     Crownalytics is also entitled to damages for losses suffered in an amount to be determined at trial.

**<u>TENTH CLAIM FOR RELIEF</u>**
**(Breach of Contract Against SPINS)**

182.     Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

183.     SPINS and Crownalytics entered into a consulting agreement effective June 29, 2017 by which Crownalytics would provide Consultant Reports and Services to certain clients that SPINS designates. ("Agreement"). Paragraph 8 of the Agreement sets forth SPINS's agreement to protect

Crownalytics's intellectual property:

> 8. <u>Intellectual Property</u>. SPINS will not offer or provide the Consultant Reports to any other SPINS client other than Designated Clients. SPINS acknowledges that the Consultant Reports and other deliverables that Consultant develops in connection with this Agreement (collectively, the "Work Product") are and will be the Consultant's sole property. SPINS may make suggestions to Consultant with respect to the Consultant Reports and will not assert any proprietary rights to such suggestions against Consultant. SPINS obtains no rights by license or otherwise in the Work Product, except that Consultant hereby grants SPINS a non-exclusive, non-sublicensable limited license solely for the purpose of making the Consultant Reports available to Designated Clients. ***SPINS may not use Consultant's Confidential Information that is a part of the Consultant Reports as a basis on which to develop or have a third party develop an Excel report that is substantially similar to the Consultant Reports. SPINS' breach of this agreement may cause irreparable harm to the Consultant and monetary damages may not be a sufficient remedy for an unauthorized disclosure, usage, sharing or selling of the Consultant Reports. If SPINS discloses the Consultant Reports in violation of this Agreement, Consultant may, without waiving any other rights or remedies and without posting a bond or other security, seek an injunction, specific performance, or other equitable remedy to prevent further disclosure, and may pursue other legal remedies.***

184.    The Agreement has not been formally terminated, but in any event, pursuant to paragraph 15g of the Agreement, paragraph 8 survives its termination.

185.    Crownalytics performed under the Agreement by providing to SPINS and the Designated Clients its Confidential Information and Consultant Reports, including its Sales Planning Tools and its Strategic and Sales Planning Services.

186.    In or about February 2021, SPINS launched a new Excel based tool called PowerTabs.

187.    SPINS used Crownalytics's Confidential Information, Consultant Reports, Sales Planning Tools, and Strategic and Sales Planning Services Reports as a basis on which to develop or have a third party develop PowerTabs in breach of its contractual obligations.

188.    SPINS's PowerTabs is substantially similar to, indeed in certain material respects identical to, Crownalytics's Excel-based data analytics tools.

189. SPINS advertises PowerTabs on its website and markets PowerTabs as a competitive alternative to Crownalytics's Data Analytics Services.

190. As a result of the foregoing, SPINS has breached paragraph 8 of the Agreement.

191. Upon information and belief, SPINS has provided Data Analytics Services using PowerTabs in partnership with DAAP and/or IRI.

192. As a result of the foregoing, Crownalytics has been damaged and irreparably harmed.

193. As a result of the foregoing, Crownalytics is entitled to injunctive relief.

194. As a result of the foregoing, Crownalytics is entitled to damages in an amount to be determined at trial.

## VIII.   <u>RELIEF REQUESTED</u>

WHEREFORE, Crownalytics demands judgment in its favor, and against Defendants, plus the following additional relief:

A. A temporary restraining order, and preliminary and permanent injunctive relief as to all Claims and as requested herein;

B. Damages in an amount to be proven at trial;

C. Treble damages on Crownalytics's antitrust claims;

D. Reasonable attorneys' fees and costs;

E. Pre- and post-judgment interest at the highest allowable legal rates; and

F. Such other and further relief as the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  May 23, 2022

*s/Rick D. Bailey*
Rick D. Bailey, Esq.
LAW OFFICE OF RICK D.
 BAILEY, ESQ
1801 Broadway, Ste. 528
Denver, CO 80202
Tel. (720) 676-6023

Pat Pascarella
Alexandra Shear
Kristen Harris
BONA LAW PC

Pat Pascarella
100 Crescent Ct. #700-3425
Dallas, TX 75201
pat.pascarella@bonalawpc.com

Alexandra Shear
287 Park Avenue South, Suite 422
New York, NY 10010
alex.shear@bonalawpc.com

Kristen Harris
4275 Executive Square, Suite 200
La Jolla, CA 92037
kristen.harris@bonalawpc.com

COUNSEL FOR PLAINTIFF

Plaintiff's Address: 9455 Crystal Lane, Longmont, CO 80503.