**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01275-NYW-SKC

CROWNALYTICS, LLC,

     Plaintiff,

v.

SPINS LLC,
DAAP, LLC, and
INFORMATION RESOURCES, INC.,

     Defendants.

---

**ORDER ON MAGISTRATE JUDGE'S RECOMMENDATION**

---

     This matter is before the Court on the Recommendation of United States Magistrate Judge S. Kato Crews issued on March 3, 2023, [Doc. 74], and the various Objections thereto. [Doc. 77; Doc. 78, filed March 17, 2023]. For the following reasons, the Objections are respectfully **SUSTAINED in part** and **OVERRULED in part** and the Recommendation is **ADOPTED in part**.

**LEGAL STANDARDS**

I.    **Rule 72(b)**

     A district court may refer a dispositive motion to a magistrate judge for recommendation. 28 U.S.C. § 636(b)(1)(B). The district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States*

*v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).[1]  Such specific objections permit "the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute."  *Id.* at 1059.

## II.    Dismissal Under Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).  The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").

## BACKGROUND

The Court draws the following facts from the Complaint and Jury Demand (the "Complaint") [Doc. 1] and presumes they are true for purposes of this Order.  This case revolves around data and data analytics in the market of natural and organic consumer packaged goods ("NOCPG").  [Doc. 1 at ¶ 4].  For purposes of background, in the NOCPG data market, providers

---

[1] In addition, the undersigned's Civil Practice Standards require that "[a] party objecting to a Magistrate Judge's Recommendation must identify, with particularity, the specific portions of the Recommendation that are the basis for the Objection," and "[o]bjections must include specific citations to the case record . . . that form the objecting party's arguments."  *See* Civ. Practice Standard 72.3(b).

collect and sell retail tracking data from various retail channels that are relevant to NOCPG manufacturers. [*Id.* at ¶ 22]. Defendants SPINS LLC ("SPINS") and Information Resources, Inc. ("IRI") are competitors in the NOCPG data market and have each "developed massive databases that are highly relevant to NOCPG customers." [*Id.* at ¶¶ 6–8, 22].[2] There are only "three providers" in the NOCPG data market—SPINS, IRI, and non-party The Nielsen Company ("Nielsen"). [*Id.* at ¶¶ 22, 24].

In the NOCPG data *analytics* market, providers—i.e., third-party data analytics firms—analyze NOCPG data for NOCPG manufacturers. [*Id.* at ¶ 33]. Plaintiff Crownalytics, LLC ("Plaintiff" or "Crownalytics") is a "data-agnostic analytics and insights consulting company" in the NOCPG data analytics market. [*Id.* at ¶¶ 4, 32]. SPINS and IRI also offer data analytics services to customers, but they are aware that their customers retain third-party data analytics firms to analyze the data purchased from SPINS and IRI. [*Id.* at ¶ 37]. According to Plaintiff, both SPINS and IRI offer their data as a standalone product, but in 2014, they began offering the "SPINS bundle," which includes both SPINS data and IRI data; the IRI data is offered at a significant discount off of the price IRI charges customers for the data. [*Id.* at ¶ 26]. The SPINS bundle can only be purchased through SPINS. [*Id.*].

Crownalytics entered the data analytics market in 2016, at which time it analyzed NOCPG data provided by its customers that the customers had purchased from SPINS, IRI, and Nielsen. [*Id.* at ¶¶ 38, 45]. By 2020, there were at "least four independent competitors" aside from SPINS

---

[2] Plaintiff alleges that "[u]pon information and belief, SPINS owns, at a minimum, a controlling interest in" Defendant DAAP LLC ("DAAP"), and that "DAAP may be a wholly owned subsidiary of SPINS." [Doc. 1 at ¶ 7]. In DAAP's Corporate Disclosure Statement, it states that it is a wholly owned subsidiary of SPINS, LLC. [Doc. 32]. Consistent with Judge Crews's convention, this Court refers to these Defendants collectively as "SPINS" unless otherwise necessary. *See* [Doc. 74].

and IRI in the data analytics market—Crownalytics and non-parties TABS Analytics, Red Fox Analytics, and Bedrock Analytics. [*Id.* at ¶ 38]. At this time, Crownalytics and SPINS "had an extremely collaborative relationship." [*Id.* at ¶ 49].

However, in the middle of 2021, "both IRI and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases." [*Id.* at ¶ 52]; *see also* [*id.* at ¶¶ 53–67]. Specifically, on May 5, 2021, IRI sent Crownalytics a cease-and-desist letter demanding that Crownalytics immediately discontinue all use of IRI data. [*Id.* at ¶ 55]. Plaintiff alleges that it responded to the cease-and-desist letter "informing IRI that it had not engaged in any of the wrongdoing alleged in that letter," but that it would comply with IRI's request.[3] [*Id.* at ¶ 56]. And around that time, SPINS created a new "partnership model" wherein customers who purchased data from SPINS but who planned to engage third-party data analytics firms to analyze the data "would only be permitted to purchase static 'extracts' of those data to share with their chosen data analytics provider." [*Id.* at ¶¶ 57, 59]. These extracts would include inferior data and would be priced to significantly increase the cost to the customer using a competing data analytics company. [*Id.*]. Crownalytics alleges that these extracts are "virtually useless" for the services performed by third-party data analytics firms. [*Id.* at ¶ 61]. It further alleges that if customers wanted to "avoid this degradation in data access and increase in data analysis cost," [*id.* at ¶ 65], "all the customer ha[d] to do [was] switch to SPINS as its data analytics services provider." [*Id.* at ¶ 64].

As a result of this alleged anticompetitive conduct, customers were "coerced to leave Crownalytics" and potential new customers opted not to engage Crownalytics. [*Id.* at ¶ 69].

---

[3] Plaintiff does not explain the "wrongdoing" that IRI purportedly accused Crownalytics of engaging in. [Doc. 1 at ¶ 56]. However, a copy of the cease-and-desist letter is included as an exhibit to IRI's Motion to Dismiss. [Doc. 42-2].

Customers began using SPINS for data analytics services, and SPINS began charging prices that were "much higher" than Crownalytics had charged.  [*Id.* at ¶ 76].  Defendants' actions have caused companies to exit the data analytics market, "leaving customers with only Defendants as their choices for data analytics services."  [*Id.* at ¶ 79].

Crownalytics initiated this civil action on May 23, 2022 against SPINS, DAAP, and IRI. *See generally* [*id.*].  Plaintiff asserts ten causes of action in this case: (1) a group boycott claim under § 1 of the Sherman Act against all Defendants ("Claim One"), [*id.* at ¶¶ 88–107]; (2) a unilateral refusal-to-deal claim under § 2 of the Sherman Act against SPINS ("Claim Two"), [*id.* at ¶¶ 108–20]; (3) a unilateral refusal-to-deal claim under § 2 of the Sherman Act against IRI ("Claim Three"), [*id.* at ¶¶ 121–33]; (4) a tying claim under §§ 1 and 2 of the Sherman Act against all Defendants ("Claim Four"), [*id.* at ¶¶ 134–48]; (5) a conspiracy to monopolize claim under § 2 of the Sherman Act against all Defendants ("Claim Five"), [*id.* at ¶¶ 149–59]; (6) a group boycott and concerted refusal to deal claim under the Colorado Antitrust Act ("CAA") against all Defendants ("Claim Six"), [*id.* at ¶¶ 160–62]; (7) a unilateral refusal to deal claim under the CAA against SPINS and IRI ("Claim Seven"), [*id.* at ¶¶ 163–66]; (8) a tying claim under the CAA against all Defendants ("Claim Eight"), [*id.* at ¶¶ 166–68]; (9) a claim for tortious interference with existing and prospective business relationships against SPINS ("Claim Nine"), [*id.* at ¶¶ 169–81]; and (10) a breach of contract claim against SPINS ("Claim Ten"), [*id.* at ¶¶ 182–94].  Plaintiff seeks injunctive and monetary relief.  *See generally* [*id.* at 37].[4]

---

[4] In the Complaint, Plaintiff seeks, as a form of relief, "[a] temporary restraining order, and preliminary and permanent injunctive relief as to all Claims and as requested herein."  [Doc. 1 at 37].  Prior to the reassignment of this action to the undersigned judicial officer, the Honorable Raymond P. Moore denied Plaintiff's Motion for Temporary Restraining Order as to Crownalytics's Claim Nine, [Doc. 10; Doc. 17], and Crownalytics subsequently withdrew its Motion insofar as it sought a preliminary injunction.  [Doc. 19].

On July 8, 2022, SPINS and DAAP jointly moved to dismiss all claims against them in this case, *see* [Doc. 40 (the "SPINS Motion to Dismiss")], as did IRI. *See* [Doc. 42 the ("IRI Motion to Dismiss")]. The Honorable Raymond P. Moore referred the Motions to Dismiss to the Honorable S. Kato Crews for recommendation. *See* [Doc. 43].[5] On March 3, 2023, Judge Crews issued a Recommendation on the Motions to Dismiss. *See* [Doc. 74]. Judge Crews recommends that each Motion be granted in part and denied in part; specifically, he recommends that the Motions be granted insofar as they seek dismissal of Claims Two, Three, Seven, and Nine. [*Id.* at 13–14, 19–21]. However, he also concludes that Plaintiff adequately alleges facts supporting the remaining six claims and recommends that the Motions to Dismiss be denied to the extent they request dismissal of those claims. [*Id.* at 5–19, 21–22].

All Defendants objected to Judge Crews's Recommendation, [Doc. 77; Doc. 78], but Crownalytics did not. On March 31, 2023, Crownalytics filed Plaintiff's Consolidated Response to Defendants' Objections to the Magistrate Judge's Recommendation on Defendants' Motions to Dismiss [Doc. 81]. The Court addresses the Parties' arguments below.

## ANALYSIS

### I.   Non-Objected-To Portions of the Recommendation

The Court first briefly addresses those portions of the Recommendation to which no objections have been filed. The Recommendation states that objections must be filed within fourteen days after service on the Parties. *See* [Doc. 74 at 23]; *see also* 28 U.S.C. § 636(b)(1)(C). The Recommendation was served on March 3, 2023. *See* [Doc. 74 at 23]. No Party has objected

---

[5] This case was reassigned to the undersigned upon her appointment as a United States District Judge on August 5, 2022. *See* [Doc. 50].

to the portions of the Recommendation wherein Judge Crews recommends that Claims Two, Three, Seven, and Nine be dismissed, and the time to do so has elapsed.[6]

In the absence of an objection, the district court may review a Magistrate Judge's recommendation under any standard it deems appropriate. *See Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a [Magistrate Judge's] factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). In this matter, the Court has reviewed the Recommendation to satisfy itself that there is "no clear error on the face of the record."[7]   Fed. R. Civ. P. 72(b), advisory committee's note to 1983 amendment.   Based on this review, the Court has concluded that this portion of the Recommendation is thorough, well-reasoned, and a correct application of the facts and the law.

Accordingly, the Recommendation is **ADOPTED** insofar as it recommends that the Court dismiss Claims Two, Three, Seven, and Nine.   The SPINS Motion to Dismiss [Doc. 40] is **GRANTED** to the extent it seeks dismissal of Claims Two, Seven, and Nine.   The IRI Motion to Dismiss [Doc. 42] is **GRANTED** to the extent it seeks dismissal of Claims Three and Seven.

## II.   Defendants' Objections

Defendants object to the portions of the Recommendation in which Judge Crews recommends that their Motions to Dismiss be denied.   *See* [Doc. 77; Doc. 78].   Because Defendants raise substantially similar arguments, the Court proceeds on a claim-by-claim basis.

---

[6] In addition, the Court notes that while SPINS and DAAP argued in their Motion to Dismiss that Plaintiff lacks antitrust standing, *see* [Doc. 40 at 10], they do not object to Judge Crews's conclusion that Plaintiff has standing to bring this case.   *See* [Doc. 74 at 7]; *see also generally* [Doc. 78].

[7] This standard of review is something less than a "clearly erroneous or contrary to law" standard of review, Fed. R. Civ. P. 72(a), which in turn is less than a *de novo* review.   Fed. R. Civ. P. 72(b).

### A.      The Sherman Act and the Colorado Antitrust Act

Plaintiff asserts several claims under the Sherman Act and the Colorado Antitrust Act.  *See generally* [Doc. 1].  "The Colorado Antitrust Act is the state law analogue to the Sherman Act," and "[b]ecause federal antitrust law principles apply to both the federal and state antitrust claims, both claims may be analyzed together."  *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1262–63 (D. Colo. 2015) (citing *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n. 1 (10th Cir. 2009)); *see also* Colo. Rev. Stat. § 6-4-119 ("It is the intent of the general assembly that, in construing [the CAA], the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws.").

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1; *see also* Colo. Rev. Stat. § 6-4-104 ("Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal."). And Section 2 renders it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2; *see also* Colo. Rev. Stat. § 6-4-105 ("It is illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce.").   Thus, while Section 1 'focuses on the anticompetitive behavior of joint actors[,'] Section 2 'covers both concerted and independent action.'"  *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1199 (D. Colo. 2019) (quoting *Lenox MacLaren Surgical Corp. v. Medtronic Inc.*, 847 F.3d 1221, 1231 (10th Cir. 2017)).

In this Order, the Court analyzes the counterpart state and federal claims together, i.e., Claims One and Six are analyzed together, as are Claims Four and Eight. However, for ease of reference, the Court will primarily refer to the applicable sections of and case law interpreting the Sherman Act, as opposed the CAA.

**B.      Unlawful Agreement – Claims One, Five, and Six**

Defendants argue that Crownalytics fails to plead plausible allegations of an unlawful agreement between SPINS and IRI, which would be fatal to Claims One, Five, and Six. They object to the portion of the Recommendation concluding that Plaintiff has adequately alleged the existence of an unlawful agreement. *See* [Doc. 77 at 2–7; Doc. 78 at 10–13]; *see also* [Doc. 74 at 11–13, 18–19].

**1.      Applicable Standards**

"Despite its semantic breadth, § 1 has long been construed to outlaw only concerted conduct by two or more separate entities that unreasonably restrains trade." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017). Thus, to state a claim under § 1 of the Sherman Act, a plaintiff must allege facts establishing (1) "the existence of an agreement or conspiracy between two or more competitors to restrain trade," and (2) that the restraint is unreasonable. *Id.* Similarly, "[t]o plead a claim for conspiracy to monopolize" under § 2, "a plaintiff must allege: (1) an agreement among two or more people to monopolize a relevant market; (2) overt acts done in furtherance of that agreement; (3) a specific intent to obtain monopoly power; and (4) an appreciable effect on commerce." *GDHI Mktg.*, 416 F. Supp. 3d at 1205.

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether

the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (quotations and alteration marks omitted).  At the pleading stage, a plausible claim "requires . . . enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.  "[M]ere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174–75 (10th Cir. 2019). "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553–54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (alterations in original)).

"If the complaint does not directly allege an agreement but instead makes only 'allegations of parallel conduct . . . in order to make a § 1 claim, [the allegations of parallel conduct] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Arapahoe Surgery Ctr.*, 80 F. Supp. 3d at 1263 (quoting *Twombly*, 550 U.S. at 557 (alterations in original)).  "For a § 1 claim to survive, then, a plaintiff must plead parallel conduct *and something 'more'*." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 557) (emphasis added). This "something more" has been characterized as "plus factors," *see, e.g.*, *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013), which are "economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action.'" *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal.

2019) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

To determine whether a plaintiff has alleged sufficient "plus factors" to give rise to an inference of an agreement, courts must "examine whether the Complaint alleges sufficient additional factors to suggest that the parallel conduct 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties,' and whether the conduct at issue is suggestive of 'the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.'" *Id.* at 916 (quoting *Twombly*, 550 U.S. at 556 n.4).  These standards equally apply to Plaintiff's conspiracy to monopolize claim arising under § 2.  *See  In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 924 (E.D. Mo. 2010).

### 2.    The Sufficiency of Plaintiff's Allegations

Defendants argue in their Motions to Dismiss that Plaintiff has failed to allege facts establishing the existence of an anticompetitive agreement between SPINS and IRI because mere allegations of parallel conduct, without more, are insufficient under *Twombly* to plead concerted conduct or a conspiracy.  [Doc. 40 at 15–17; Doc. 42 at 14–15].  Plaintiff argues in its Response that it has plausibly pled the requisite "plus factors" suggesting "that IRI agreed with SPINS to restrain trade in the Data Analytics Market."  [Doc. 51 at 15].  In support, Plaintiff argues that "[t]he decision to prohibit access to the SPINS/IRI bundle necessarily prohibited access to IRI's data.  Thus, IRI either agreed with SPINS's decision to prohibit access to the SPINS/IRI bundle, or IRI agreed that SPINS would act on its behalf.  Either is sufficient demonstration of an agreement."  [*Id.*].

Judge Crews concluded that, while the allegations of IRI's and SPINS's separate acts of limiting Plaintiff's access to their data "[t]aken in isolation, . . . likely would not state parallel conduct," Plaintiff's other allegations—namely, that (1) SPINS began the process of limiting access to its data contemporaneously with IRI's cease-and-desist letter; (2) IRI and SPINS entered into an agreement in 2014 for the sale of the SPINS bundle to their customers; (3) IRI and SPINS informed customers that "they would only be able to access the full data purchased (including the bundle) if they also retained SPINS for analytics services"; and (4) SPINS's agent admitted or acknowledged that third-party data analytics servicers would likely not exist in the future— "support a plausible inference of an agreement between SPINS and IRI to unreasonably restrain the data-analytics market." [Doc. 74 at 12–13].[8]  Judge Crews further observed that while Plaintiff's allegations primarily concern SPINS's actions, it is IRI's continued authorization of the SPINS bundle that supports an inference that it is a willing participant in this alleged restraint on trade. [*Id.* at 13 n.8].  Defendants object to Judge Crews's conclusion and argue that despite Plaintiff's characterization of its allegations in its Response, the Complaint does not contain sufficient factual allegations to allege both parallel conduct and the "plus factors" necessary to suggest the existence of an agreement. [Doc. 77 at 5–7; Doc. 78 at 10–13].  In Plaintiff's Response to the Objections, it argues that it alleges more than parallel conduct "because [it] alleged direct evidence that IRI and SPINS in fact agreed to provide products into the SPINS/IRI bundle and

---

[8] In its Response, Plaintiff argued it also alleged direct evidence of an agreement.  Judge Crews did not address whether there were sufficient allegations of an explicit agreement.  *See* [Doc. 74 at 11–13].  No Party objected to this lack of discussion and this issue is thus not presently before the Court.  For the reasons set forth in this section, on de novo review, the Court is unpersuaded by Plaintiff's reliance on the 2014 agreement and its argument that this demonstrates an unlawful agreement by SPINS and IRI in 2021.

later used that bundle to foreclose the separate Data Analytics Market." [Doc. 81 at 9]. The Court respectfully agrees with Defendants' arguments.

Plaintiff alleges in its Complaint that "SPINS serves as the primary sales channel for IRI's NOCPG data. . . . Most significantly, as a result of its arrangement with IRI, SPINS—and only SPINS—also offers a bundle of IRI and SPINS retail tracking data that reflects relevant transactions from various types of NOCPG retail channels." [Doc. 1 at ¶ 14]. Plaintiff also alleges that the SPINS bundle cannot be replicated. [*Id.*]. Plaintiff further avers that "[i]n mid-2021, both IRI and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases." [*Id.* at ¶ 52]. Specifically, on May 5, 2021, IRI sent Crownalytics a cease-and-desist letter demanding that Crownalytics cease use of IRI's data, [*id.* at ¶ 55], and in June 2021, SPINS's agent told Crownalytics that SPINS was moving to a new business model that would limit the data purchased by customers who used third-party analytics services. [*Id.* at ¶¶ 58–59]. But "mere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim." *Musical Instruments*, 798 F.3d at 1193; *see also, e.g.*, *Pro Camera Repair, Inc. v. Canon U.S.A., Inc.*, No. 12-cv-00846-CAB (JMA), 2013 WL 12124603, at *4 (S.D. Cal. Mar. 19, 2013) (allegation that defendants "both stopped selling to plaintiff in January 2012 is at most an indication of parallel conduct which, combined with plaintiff's 'bare assertion' that defendants entered an agreement, does not suffice"). Rather, "Plaintiff[] must plead 'something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *Musical Instruments*, 798 F.3d at 1193. Plus factors that "tend to demonstrate the existence of an agreement" include (1) allegations about the defendants' motive to enter into an unlawful agreement; (2) allegations that the defendants acted contrary to their interests; or (3) allegations

13

"implying a traditional conspiracy." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011); *see also Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (also noting that "a high level of interfirm communications" is an appropriate "plus factor").

In its Response to the Motions to Dismiss, Plaintiff argued that it pled sufficient "plus factors" to suggest an unlawful agreement, directing the Court to the allegations in Paragraphs 14–16, 18, 24, 52, 57, and 94. *See* [Doc. 51 at 15]. However, the allegations in these Paragraphs are either conclusory, *see, e.g.*, [Doc. 1 at ¶¶ 52, 94], or fail to allege sufficient "plus factors" necessary to plead the "something more" than parallel conduct required by *Twombly*. For example, the fact that SPINS and IRI entered into an agreement *in 2014* to offer the SPINS bundle, *see* [*id.* at ¶¶ 14–16, 26], does not plausibly establish that their *2021 conduct*, even if considered parallel, is "suggestive of the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Jones*, 400 F. Supp. 3d at 916 (quotation omitted). The Complaint contains no allegations that SPINS and IRI entered into any agreement to restrain trade between the years of 2014 and 2020, and in fact alleges that Crownalytics successfully worked with IRI and SPINS for years after Crownalytics entered the market in 2016. [Doc. 1 at ¶¶ 45–49]. Although it is mindful that there is an asymmetry of information between Plaintiff and Defendants with respect to Defendants' communications, the Court is not persuaded that a business arrangement long preceding the alleged parallel conduct alone is indicative of anticompetitive conduct seven years later. *See Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *12 (D. Colo. Apr. 7, 2010) ("'[T]rack record' allegations . . . do not give rise to an inference of agreement under *Twombly*."); *compare In re Ins. Brokerage Antitrust Litig.*, No. CV 04-5184 (CCC), 2017 WL 3642003, at *2 (D.N.J. Aug. 23, 2017) (allegations were sufficient to allege unlawful agreement where the pleading alleged that the defendants collaborated

to "share sensitive information and discuss, coordinate and agree on virtually every aspect of how the [the market] functions, including pricing, terms, broker compensation, risk sharing and avoidance of legal liability," and provided specific factual allegations in support).

Further, Plaintiff's suggestion that SPINS's decision to limit Crownalytics's access to the SPINS bundle "necessarily prohibited access to IRI's data" and thus, it follows that "IRI either agreed with SPINS's decision to prohibit access to the [SPINS] bundle, or IRI agreed that SPINS would act on its behalf," [Doc. 51 at 15], is not supported by any affirmative allegations in the Complaint. *See Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983) (a court cannot "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *see also Pro Camera Repair*, 2013 WL 12124603, at *4.[9]  And though Judge Crews found that IRI's continued authorization of the SPINS bundle supported an inference that it is a willing participant in this alleged restraint on trade, there are insufficient factual allegations to support the conclusion that IRI is a "willing participant" in the alleged restraint on trade, or more importantly, that there was a concerted effort by the Defendants.  For instance, the facts alleged in the Complaint do not show that the continued authorization was voluntary as opposed to contractually obligated under the agreement between SPINS and IRI.

---

[9] Further, SPINS's agent's comments about the future of third-party data analytics providers, *see* [Doc. 1 at ¶ 67], supports only the agent's subjective outlook of the market, but does not actually plausibly allege a meeting of the minds between IRI and SPINS or provide support to the allegation that SPINS and IRI entered into an anticompetitive agreement.  Plaintiff's argument that the agent's "statement would be nonsensical absent such an agreement because without IRI's agreement with SPINS, customers could simply shift their business to IRI if SPINS alone sought to enforce such a bar," *see* [Doc. 81 at 8], is not supported by citations to the Complaint and is more appropriately raised at the summary judgment stage.

For these reasons, the Court respectfully concludes that the Complaint does not plausibly allege "plus factors," in addition to parallel conduct, that plausibly establish the existence of an anticompetitive agreement between SPINS and IRI. The Court will thus sustain Defendants' objections with respect to Claims One, Five, and Six. The Motions to Dismiss will be **GRANTED** with respect to those claims.

### C.     Tying Claims – Claims Four and Eight

A tying arrangement exists "when a seller conditions its sale of a product (the 'tying' product) on the purchase of a second product (the 'tied' product)," *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017), or when the seller conditions a sale on the buyer's agreement "that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992). "Since tying arrangements can be used for good or for ill (i.e., can have procompetitive or anticompetitive effects), the arrangement itself is only problematic when it is used to unreasonably restrain trade." *Suture Express*, 851 F.3d at 1037. "[T]he crux of tying lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer . . . might have preferred to purchase elsewhere on different terms." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016) (quotation omitted).

"[T]ying arrangements can be analyzed using a per se rule or a rule of reason." *Suture Express*, 851 F.3d at 1037. "Should a plaintiff be unable to establish the *per se* version of the claim, the Tenth Circuit permits the Rule of Reason alternative," which "entails 'a more thorough examination of the purposes and effects of the practices involved' and 'an inquiry into the actual effect of the tying arrangement on competition' based on a 'real-market analysis.'" *Chase Mfg., Inc. v. Johns Manville Corp.*, 601 F. Supp. 3d 911, 933 (D. Colo. 2022) (quoting *Suture Express*,

851 F.3d at 1037–38).   In its Response to the Motions to Dismiss, Crownalytics argued that it adequately alleged a *per se* tying claim.  *See* [Doc. 51 at 14–15].[10]

To state a plausible *per se* tying claim, a plaintiff must allege facts showing that "(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other," or an agreement to not purchase the product from competitors; "(3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Suture Express*, 851 F.3d at 1037 (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997)); *Eastman Kodak Co.*, 504 U.S. at 461. SPINS and IRI each challenged Plaintiff's allegations with respect to the second and third elements in their Motions to Dismiss.  *See* [Doc. 40 at 23; Doc. 42 at 23].  Judge Crews concluded that Plaintiff adequately stated both elements.  [Doc. 74 at 15–18].

In their objections, Defendants focus only on the second element: the existence of a conditioned sale.  *See* [Doc. 77 at 8–10; Doc. 78 at 6–9].  SPINS argues that the Complaint contains no allegations that "a customer may purchase SPINS data only on the condition that it also purchase SPINS analytics services," or that "SPINS conditioned the purchase of its data (or the

---

[10] The Court notes that Crownalytics also states, in a footnote, that "Crownalytics adequately alleges a *per se* tying claim.  But if the Court finds that claim should be analyzed under the rule of reason, Crownalytics has also alleged the requisite harm to competition to satisfy the pleading requirements of such a claim." [Doc. 51 at 15 n.7].  This argument is not supported by any citations to legal authority (or the Complaint) or any substantive explanation, and is thus not adequately presented to the Court.  *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").  "While failure to state a *per se* tying claim does not foreclose resort to a Rule of Reason theory, a failed attempt to state a *per se* tying claim does not necessarily survive a motion to dismiss merely because there has been an oblique invocation of the Rule of Reason." *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 586 F. Supp. 155, 161 (N.D. Ill. 1983), *aff'd*, 758 F.2d 203 (7th Cir. 1985).

'SPINS bundle') on an agreement not to retain Crownalytics." [Doc. 78 at 7]. IRI raises a similar contention. [Doc. 77 at 9]. The Court is respectfully unpersuaded by Defendants' arguments.

To be sure, while the Court agrees that there are no express allegations that the sale of Defendants' data was conditioned on customers' agreement to use Defendants' analytics services, such allegations are not required to state a tying claim. The allegations in the Complaint suggest the presence of a "negative tie." *See* [Doc. 1 at ¶ 139]. A negative tie occurs "when the customer promises not to take the tied product from the defendant's competitor." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016); *see also In2 Networks, Inc. v. Honeywell Int'l*, No. 2:11-cv-6-TC, 2011 WL 4842557, at *8 (D. Utah Oct. 12, 2011) ("In2 alleges that Honeywell conditioned the sale of its products on the third-party not buying In2 products. This type of 'negative tie' can be the basis of a tying claim."). Courts "rarely encounter" claims based on negative ties, *Aerotec*, 836 F.3d at 1178, and thus, there is little case law discussing the pleading requirements of such a claim. However, courts appear to agree that to state a negative tying claim, the plaintiff must allege that "the buyer 'agree[d] that he [would] not purchase the tied product from *any other supplier*." *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080 (S.D. Cal. 2012) (emphasis added) (quoting *Eastman Kodak Co.*, 504 U.S. at 461); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994) (describing a negative tying arrangement as an "arrangement[] conditioning the sale of one product on an agreement not to purchase a second product *from competing suppliers*" (emphasis added)), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

Turning to IRI's arguments first, IRI argues that Crownalytics fails to allege facts establishing a negative tie because it fails to allege that the sale was conditioned on an agreement that the customers would not purchase analytics services "*from any other supplier*." [Doc. 77 at 9

(emphasis in original)].  As a preliminary matter, the Court notes that IRI failed to raise this specific argument in its Motion to Dismiss.  Indeed, while it attacked the allegations with respect to this element in its Motion, IRI did so by arguing that a negative tying claim "is viable only if the *buyer agrees* that he will not purchase" the tied product from another supplier, and that "[t]he Complaint contains no factual allegation at all supporting the assertion that IRI conditions the *sale* of its data on customers' agreement to not use Crownalytics for data analytics."  [Doc. 42 at 24 (emphasis in original) (quotation omitted)].  For the first time in its Objections, IRI emphasizes the requirement that a negative tying claim be supported by allegations that the sale of a product was conditioned on a promise to not purchase the product from *any other supplier*.  *See* [Doc. 77 at 9]; *see also Eastman Kodak Co.*, 504 U.S. at 461.  The undersigned's Civil Practice Standards require that "[s]hould the objecting party seek to make arguments . . . that were not raised before the Magistrate Judge, such party *must* expressly identify those arguments . . . and explain why such omitted arguments . . . should be considered, in the first instance, upon Objection."  Civ. Practice Standard 72.3(b) (emphasis added).  IRI fails to explain its failure to raise this argument in its Motion and fails to explain why the Court should address this argument that was not raised before Judge Crews.  *See generally* [Doc. 78].  The Court thus declines to consider this argument at this juncture.

For purposes of completeness, however, and to address SPINS's similar argument, the Court simply notes that the Complaint *does* allege that Defendants' sale of data is conditioned on customers' agreement not to use any third-party data analytics providers.  Plaintiff plainly alleges that "Defendants coerced customers into contracts . . . which operate as negative tying arrangements by conditioning the purchase and use of data on an agreement not to purchase or use the services of Crownalytics (*and other competitors in the Data Analytics Market*)."  [Doc. 1 at

¶ 139 (emphasis added)]; *see also* [*id.* at ¶ 18].  Crownalytics also alleges that "Defendants have sent cease and desist letters telling customers that they cannot provide access *to third parties* such as Crownalytics, except in the limited, pretextual manner described above," i.e., SPINS customers that wished to use third-party data analytics servicers could only purchase static extracts of data, which include "inferior data."  [*Id.* at ¶¶ 59, 159 (emphasis added)].  Stated differently, if customers are instructed by Defendants that they cannot provide their data to third-party providers, they have essentially instructed customers that they cannot have that data analyzed by third-party providers, i.e., they have conditioned the sale on the agreement to not use third-party servicers.  While these allegations may be limited in detail, the Court cannot conclude that they are inadequate, particularly when they were asserted pre-discovery.  In combination, Plaintiff has sufficiently alleged that Defendants conditioned the sale of their data on the customers' agreement to not use any third-party data analytics providers.[11]

Next, SPINS argues that the Complaint does not allege a conditioned sale because "the [C]omplaint acknowledges that some customers analyze data themselves using in-house resources rather than third-party analytics firms."  [Doc. 78 at 7 (citing Doc. 1 at ¶ 34)].  But an allegation about the data analytics market generally—that some customers "may perform some data analysis *themselves*, using 'in-house' professionals," *see* [Doc. 1 at ¶ 34 (emphasis added)]—does not

---

[11] The Court is not persuaded by IRI's argument that Plaintiff's allegations are contradicted by its assertion that "[c]ustomers also reported that SPINS was falsely disparaging Crownalytics and recommending an alternative data analytics provider, Red Fox, in the event they did not wish to use SPINS."  [Doc. 1 at ¶ 68]; *see also* [Doc. 77 at 9].  The Court notes that Plaintiff alleges that this occurred "[w]hile SPINS's anticompetitive 'partnership' plan was not yet fully in effect," and it is not clear from the Complaint when this alleged recommendation occurred.  *See* [*id.*].  Thus, it does not clearly contradict Plaintiff's allegation that once the partnership plan was in effect, the sale of Defendants' data was conditioned on the non-use of third party servicers.

contradict Plaintiff's assertion that Defendants conditioned the sale of their data on customers' agreement to not use *third-party* providers.  [*Id.* at ¶ 139].

In the alternative, SPINS contends that "numerous courts have rejected what Crownalytics attempts here—to pass off a refusal-to-deal claim as a tying claim."  [Doc. 78 at 9 (citing cases)]. SPINS does not develop this argument, instead stating that "[a]lthough SPINS and DAAP cited this precedent in support of their motion, the Recommendation does not even address this line of cases.  Upon its *de novo* review, the Court should dismiss the tying claim for failure to allege a conditioned sale."  [*Id.*]; *see also* [*id.* at 7 (arguing that Plaintiff's tying claim is "the refusal to deal claim under a different name")].  However, "[a] general objection that does not put this Court on notice of the basis for the objection will not preserve the objection for de novo review."  Civ. Practice Standard 72.3(b).  And any attempt to simply incorporate arguments raised in the Motion to Dismiss is a procedurally improper attempt to circumvent the Civil Practice Standards' page limitations, of which SPINS was already granted an extension.  *See* [Doc. 76].  In any event, the Court has reviewed the cases cited by SPINS and is not persuaded that they should change this Court's analysis here.[12]

---

[12]  For example, *Aerotec* is distinguishable; in that case, the Ninth Circuit concluded—in the summary-judgment context—that a plaintiff could not succeed on a tying claim where there was no evidence that the defendant explicitly or implicitly tied or conditioned the sale of a product to customers' purchase of maintenance services and where he plaintiff "[did] not dispute" that the defendant "routinely" sold products without conditions.  *Aerotec*, 836 F.3d at 1178–79.  And in *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827 (10th Cir. 2016), the Tenth Circuit, again in the summary-judgment context, discussed cases standing for the proposition that a company has no duty to share or continue to share its intellectual or physical property with a rival. *See SOLIDFX*, 841 at 841–43.  Any such argument is better raised at the summary-judgment stage in light of a record developed through discovery; at this stage in the proceedings, considering only the allegations in the Complaint, the Court is not persuaded that this argument warrants dismissal of Plaintiff's tying claims.

In sum, the Court is unpersuaded by the arguments raised in Defendants' Objections with respect to the tying claims. The Objections are therefore overruled with respect to Claims Four and Eight, the Recommendation is **ADOPTED** with respect to those claims, and the Motions to Dismiss are **DENIED** to the extent they seek dismissal of Plaintiff's tying claims.[13]

### D.        Breach of Contract Claim – Claim Ten

Finally, SPINS objects to Judge Crews's Recommendation that the SPINS Motion to Dismiss be denied to the extent it seeks dismissal of Plaintiff's breach of contract claim. [Doc. 78 at 16–18]. SPINS argued in its Motion to Dismiss that the claim should be dismissed for improper venue, *see* [Doc. 40 at 30–31], and repeats this argument in its Objections. [Doc. 78 at 16–17].

Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b). "Under § 1391(b)(2), venue is not limited to the district where the majority of the events or omissions occurred." *Premier Grp., Inc. v. Bolingbroke*, No. 15-cv-01469-PAB-CBS, 2015 WL 4512313, at *4 (D. Colo. July 27, 2015). "Rather, § 1391(b)(2) contemplates that venue can be appropriate in more than one district . . .

---

[13] In their Motion to Dismiss, SPINS and DAAP argued that "the absence of well-pleaded allegations of an unlawful horizontal agreement" in the context of Plaintiff's group-boycott claims "dooms any § 1 claim" based on a tying arrangement. [Doc. 40 at 22]. However, the Tenth Circuit has held that

> a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller. The essence of section 1's contract, combination, or conspiracy requirement in the tying context is the agreement, however reluctant, of a buyer to purchase from a  seller a tied product or service along with a tying product or service. To hold otherwise would be to read the words "contract" and "combination" out of section 1.

*Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137, 1142–43 (10th Cir. 1997) (footnote omitted). Thus, the Court's conclusion with respect to the lack of allegations establishing an unlawful agreement between SPINS and IRI does not necessitate dismissal of Plaintiff's tying claims.

[and] permits venue in multiple judicial districts as long as a substantial part of the underlying events took place in those districts." *Id.* (quotation omitted and alterations in original).

Under Rule 12(b), defendant may request dismissal of a claim for "improper venue." Fed. R. Civ. P. 12(b)(3). The Court emphasizes the Rule's use of the word *improper*, which means that Rule 12(b)(3) "authorize[s] dismissal only when venue is '*wrong*' . . . in the forum in which it was brought." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013) (emphasis added). "Once venue is challenged, it is the plaintiff's burden to show that venue is proper in the forum district." *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324 (D. Colo. 2019). In considering a Rule 12(b)(3) motion to dismiss, the Court may examine facts outside of the Complaint, but must accept all well-pleaded allegations as true if uncontroverted by the defendant's evidence and must draw all reasonable inferences and resolve all factual ambiguities in the plaintiff's favor. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012).

In the Motion to Dismiss, SPINS argued that venue is improper in Colorado because "[t]here is no allegation" in the Complaint "suggesting that a 'substantial'—or any—part of the events material to the alleged breach occurred in Colorado." [Doc. 40 at 30–31]. SPINS did not present any evidence in support of its argument that venue is improper in Colorado. *See* [*id.*].

In his Recommendation, Judge Crews recommended that this portion of the SPINS Motion to Dismiss be denied upon concluding that Plaintiff had made a prima facie showing that venue is proper in this forum. [Doc. 74 at 22]. In so doing, Judge Crews noted that SPINS had offered no evidence in support of its venue arguments and instead "relie[d] on the allegations that it is a Delaware corporation headquartered in Illinois and that it breached the contract in Illinois." [*Id.*]. But Judge Crews also noted that Crownalytics had alleged that it is a Colorado-based LLC with its principal place of business in Longmont, Colorado. [*Id.*]. Judge Crews concluded that

"[w]ithout any evidence to the contrary, and construed in the light most favorable to Plaintiff, these allegations support a reasonable inference Plaintiff negotiated the contract in Colorado and performed its consulting services from here," and concluded that it is "reasonable to infer Plaintiff suffered any related economic damages in Colorado." [*Id.*]. For these reasons, Judge Crews recommends that this portion of the SPINS Motion to Dismiss be denied. [*Id.*].

The Court respectfully agrees with Judge Crews. While SPINS argues that a plaintiff's choice of forum is entitled to little weight where the facts giving rise to the lawsuit "have no material relation or significant connection to the plaintiff's chosen forum," [Doc. 78 at 17 (quotation omitted)], the Court notes that the "weight" to be afforded to a plaintiff's choice of forum comes into play where there is a request to *transfer* venue under 28 U.S.C. § 1404(a), which requires courts to weigh several factors, including the plaintiff's choice of forum. *See Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167–68 (10th Cir. 2010); *see also Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992). But under Rule 12(b)(3), it is not this Court's role to weigh factors to determine "which forum has the most, or most significant, contacts with plaintiff's claims." *Sanchez v. Miller*, No. 15-cv-01615-REB-MEH, 2016 WL 675816, at *3 (D. Colo. Feb. 19, 2016). Rather, the Court's inquiry is limited to determining whether Plaintiff's choice of forum is *wrong* or *improper*. *Atl. Marine*, 571 U.S. at 55.

Second, the Court is respectfully unpersuaded by SPINS's argument that venue is improper because the Complaint "alleges nothing about where the events giving rise to the claim occurred,— i.e., where the alleged breach by Chicago-based SPINS (through the development of a competing product) occurred." [Doc. 78 at 17 (quotation omitted)]. "The Tenth Circuit has declined to hold that the venue inquiry is necessarily limited to the defendant's actions," *Premier Grp.*, 2015 WL 4512313, at *4 (citing *Bartile Roofs*, 618 F.3d at 1166 n.11), and "the Court does not confine its

analysis to defendant's actions alone." *Advisors Excel, LLC v. Zagula Kaye Consulting, LLC*, No. 15-4010-DDC-KGS, 2015 WL 11089657, at *4 (D. Kan. Feb. 20, 2015).  Rather, "[i]n determining the proper venue for a breach of contract action, relevant factors include where the contract was negotiated or executed, where it was to be performed, *and* where the alleged breach occurred." *Premier Grp.*, 2015 WL 4512313, at *6 (emphasis added).  Neither Party has presented evidence as to these factors.

The Court must accept all of the allegations in the Complaint as true and must construe all reasonable inferences in Plaintiff's favor.  *Hancock*, 701 F.3d at 1260.  Although Plaintiff's allegations are sparse, the Court concludes that they are sufficient to plausibly allege that a significant part of the events or omissions giving rise to the breach of contract claim occurred in Colorado.  Plaintiff alleges that it is a Colorado-based limited liability company with its principal place of business in Colorado.  [Doc. 1 at ¶ 4].  It is axiomatic that a Colorado-based company with its principal place of business in Colorado would perform its contractual obligations—a requisite element of a breach of contract claim, *see W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)—in Colorado.  Indeed, Plaintiff alleges that at least two dozen of its customers *that are also SPINS customers* reside in Colorado, [Doc. 1 at ¶ 2], and that, under the contract with SPINS, Crownalytics was to "provide Consultant Reports and Services to certain clients that SPINS designates," and "Crownalytics performed under the Agreement by providing to SPINS and the Designated Clients its Confidential Information and Consultant Reports, including its Sales Planning Tools and its Strategic and Sales Planning Services."  [*Id.* at ¶¶ 183, 185].  A reasonable inference thus may be drawn from these allegations that at least a portion of the subject contract was performed in Colorado.  *See Value Chain Sols., LLC v. Quality One Wireless, LLC*, No. 09-

2586-JAR, 2010 WL 1643690, at *6 (D. Kan. Apr. 20, 2010) (finding venue proper in Kansas where, *inter alia*, the contract "was at least partially performed in Kansas").

Furthermore, Plaintiff alleges that SPINS breached the agreement by improperly using Crownalytics's intellectual property, *see* [Doc. 1 at ¶¶ 183, 187–91], which again, was presumably developed or created in Colorado by this Colorado-based company. *See Concert Water Techs., Inc. v. Hughes*, No. CIV.A. 10-1398-MLB, 2011 WL 765878, at *2 (D. Kan. Feb. 25, 2011) ("[D]efendants allegedly are in possession of Concert's intellectual property. Concert's loss of its property and business accounts have allegedly damaged its business in Kansas. The court concludes that these actions satisfy the requirements under Section 1391[(b)](2) and therefore venue in Kansas is proper.").

"Once the plaintiff makes a prime facie showing that venue is proper in the chosen district, that showing is sufficient notwithstanding the contrary presentation by the moving party." *Fuanya v. United States*, No. 21-cv-02191-REB-NYW, 2022 WL 1027149, at *1 (D. Colo. Apr. 6, 2022) (citation and quotation omitted). The Court finds that Plaintiff has alleged sufficient facts to meet its prima facie burden, and absent any contrary showing from SPINS, the Court cannot conclude that venue in Colorado is improper. Accordingly, SPINS's objections to the Recommendation with respect to venue are overruled, this portion of the Recommendation is **ADOPTED**, and the SPINS Motion to Dismiss is **DENIED** with respect to the breach of contract claim.

## III.   Leave to Amend

In its Response, Plaintiff states that "[i]f the Court is inclined to grant Defendants' motions to dismiss in whole or part, Crownalytics respectfully requests leave to amend its complaint to amend any deficiencies identified by the Court." [Doc. 51 at 34]. The Local Rules of Practice require that requests for leave to amend must be made in a separate motion, rather than in a

response brief.  *See* D.C.COLO.LCivR 7.1(d).  Typically, this Court does not consider requests to amend the complaint that are raised in a response brief.

However, the circumstances of this case lead the Court to reach a different decision here. Whether to grant leave to amend is within this Court's discretion, *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006), and leave to amend should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Court notes that Plaintiff has not yet amended its pleading in this case and Defendants do not meaningfully argue that Plaintiff's claims should be dismissed with prejudice or that amendment would be futile.  *See* [Doc. 40; Doc. 42].[14]  And significantly, Plaintiff states in its Response to the Motions to Dismiss that "Crownalytics filed its complaint before Defendants' restraint became effective, and it now has additional factual information it could add to the allegations regarding the effect of the restraints."  [Doc. 51 at 34].  Based on this representation and the fact that, in the Court's view, the issues in this case are close, the Court finds that granting Plaintiff limited leave to amend is appropriate in this case.  *See Schmidt v. Wells Fargo & Co.*, No. 17-cv-01555-RBJ, 2018 WL 1522609, at *8 (D. Colo. Mar. 28, 2018) ("Because the Court cannot rule out the possibility that plaintiff could, in good faith, allege facts that would plausibly support one or more of his claims, this dismissal will be without prejudice and with leave to amend.").

Accordingly, Plaintiff is hereby **GRANTED** leave to file an Amended Complaint within **21 days** of the date of this Order, <u>but amendment is permitted only with respect to Claims One, Five, and/or Six</u>.  If Plaintiff wishes to replead any other claims, or assert any new causes of action,

---

[14] While SPINS cursorily argues that Plaintiff's claims should be dismissed with prejudice, *see* [Doc. 40 at 4], it does not explain why it takes this position or argue that amendment would be futile.  *See generally* [*id.*].

<u>Plaintiff must obtain the consent of Defendants or leave of Court, via a formal motion, prior to filing any such amendment</u>.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Objections [Doc. 77; Doc. 78] are **SUSTAINED in part** and **OVERRULED in part**;

(2)    The Recommendation of United States Magistrate Judge S. Kato Crews [Doc. 74] is **ADOPTED in part**;

(3)    Defendants SPINS, LLC's and DAAP, LLC's Motion to Dismiss Plaintiff's Antitrust and Tort Claims Pursuant to Fed. R. Civ. P. 12(b)(6), and to Dismiss Its Contract Claim Pursuant to Fed. R. Civ. P. 12(b)(3) [Doc. 40] is **GRANTED in part** and **DENIED in part**;

(4)    Defendant Information Resources, Inc.'s Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. 42] is **GRANTED in part** and **DENIED in part**;

(5)    Claims One, Five, and Six are **DISMISSED without prejudice**, but Plaintiff is **GRANTED LEAVE** to file an Amended Complaint that amends only these Claims within **21 days** of the date of this Order; and

(6)     Claims Two, Three, Seven, and Nine are **DISMISSED without prejudice**.[15]

DATED:  April 25, 2023                          BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

[15] Because the issue of futility has not been substantively argued before the Court, the Court will dismiss the claims without prejudice.  *See Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) ("[D]ismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile" (quotation omitted)).