IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01275-NYW-SKC

CROWNALYTICS, LLC, a Colorado Limited Liability Company

Plaintiff,

v.

SPINS LLC, a Delaware Limited Liability Company; DAAP, LLC a
Delaware Limited Liability Company; and INFORMATION
RESOURCES, INC., a Delaware Corporation

Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

This is an action for damages and injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and other federal and state laws, including the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-101 *et seq.,* arising out of the unlawful and anticompetitive practices of Defendants SPINS, LLC ("SPINS"); DAAP, LLC ("DAAP"); and Information Resources, Inc. ("IRI") (collectively, "Defendants"). Crownalytics alleges as follows upon actual knowledge with respect to itself and its own acts and upon information and belief as to all others:

## I.   **<u>JURISDICTION AND VENUE</u>**

1.     This Court has subject matter jurisdiction over Crownalytics's claims relating to violations of Sections 1 and 2 of the Sherman Act, under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 15. The Court has supplemental jurisdiction over Crownalytics's state law claims pursuant to 28 U.S.C. § 1367(a). Crownalytics's federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution. These actions have affected interstate commerce.

2.     This Court has personal jurisdiction over Defendants because they each transact business in the District of Colorado, are registered with the Colorado Secretary of State, and maintain registered agents for service of process in Colorado. Crownalytics, a Colorado company, is a competitor in the data analytics market and is being injured by Defendants' anticompetitive conduct. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado. Both IRI and SPINS serve Colorado-based customers and over two dozen of Crownalytics's and SPINS's mutual customers reside in Colorado.

3.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391. A substantial part of Defendants' wrongful acts occurred in and were directed to the District of Colorado.

II.    **THE PARTIES**

4.      Plaintiff Crownalytics is a Colorado Limited Liability Company with its principal place of business at 9455 Crystal Lane, Longmont, CO 80503. Crownalytics is a data-agnostic analytics and insights consulting company that provides data analytics services to customers that manufacture and sell natural and organic consumer packaged goods ("NOCPG"). NOCPG is an industry-recognized segment in the broader consumer packaged goods marketplace. Crownalytics turns hard-to-use retail sales tracking data purchased by its customers into meaningful and actionable information and insights that help them optimize their sales and marketing strategies. Crownalytics has competed and thrived in this market for years by offering premium services at the lowest prices in the industry.

5.      Defendant SPINS is a Delaware Limited Liability Company with its principal place of business at 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. SPINS provides retail tracking data (also called purchase or point-of-sale data) relevant to the NOCPG industry. These are data collected from retail sales channels which customers of SPINS can then buy a license to access and use. Since 2017, SPINS also has provided data analytics services in competition with independent providers. SPINS provides these services both directly and through its subsidiary, DAAP. Since 2021, SPINS also has marketed a data analytics tool called PowerTabs.

6.      Defendant DAAP is a Delaware Limited Liability Company with its principal place of business at the same location as SPINS, 222 W. Hubbard Street, Suite 300, Chicago, IL 60654. Upon information and belief, SPINS owns, at a minimum, a controlling interest in DAAP, and DAAP may be a wholly owned subsidiary of SPINS. DAAP also provides data analytics services. Upon information and belief, DAAP participated, or was an instrumentality of SPINS, in the planning and execution of the wrongful conduct and conspiracy alleged in this complaint. (References to "SPINS's data analytics services" refer to analytics services offered by SPINS

and/or DAAP.)

7.     Defendant IRI is a Delaware Corporation with its principal place of business at 203 N. LaSalle Street, Suite 1500, Chicago, IL 60601. IRI also provides retail tracking data relevant to NOCPG manufacturers. IRI provides retail tracking data in other market segments as well. As with SPINS, IRI's customers buy a license to access and use these data. IRI also offers data analytics services in this market directly and through its partnership with its data analytics competitor, SPINS.

## III.    NATURE OF THE ACTION

8.     Defendants IRI and SPINS are two of the three competitors in the market for the sale of retail tracking data relevant to NOCPG manufacturers ("NOCPG Data Market" or "Data Market"). Defendants collect these point-of-sale data from retailers and sell licenses to use that retail data to NOCPG manufacturers. These manufacturer customers buy the data from IRI and SPINS, and then employ data analytics firms like Crownalytics to analyze the data for them.

9.     Crownalytics provides data analytics services to NOCPG manufacturers. The market for data analytics services provided to manufacturers of NOCPG ("NOCPG Data Analytics Market" or "Data Analytics Market") was competitive until Defendants began working together to foreclose competition in that market.

10.    Because the NOCPG Data Market is upstream from the Data Analytics Market, the state of competition—or lack thereof—in the NOCPG Data Market has consequences for the Data Analytics Market.

11.    SPINS and IRI by themselves have sufficient market power in the NOCPG Data Market to foreclose competition in the downstream Data Analytics Market. But, as explained further below, SPINS and IRI working in concert are even better positioned to do so. At issue here is IRI's and SPINS's use of their market power individually and jointly in the NOCPG Data

Market—in which they are horizontal competitors—to drive out competition from the Data Analytics Market—in which they also are horizontal competitors of each other and Crownalytics.

12.     In the three-supplier NOCPG Data Market, direct competitors IRI and SPINS decided to forgo competition and instead entered an agreement to combine and coordinate the sale and provision of their competing data sets.  Under this current and ongoing anticompetitive and illegal agreement not to compete, SPINS serves as the primary sales and distribution channel for IRI's NOCPG data as well as the sole sales channel for its own data. As a result of its arrangement with IRI, SPINS—and only SPINS—also offers a bundle of IRI and SPINS retail tracking data (hereafter, the "SPINS/IRI Bundle"). Neither the IRI or SPINS data, nor the SPINS/IRI Bundle, can be replicated, so the barriers to entry for this market are high and new entry is impractical and improbable. This ongoing horizontal agreement between SPINS and IRI constitutes a *per se* antitrust violation because it involves two separate economic entities that should compete, but instead have agreed to allocate markets and fix prices.

13.     While it is possible for at least some large customers to procure IRI data separately from IRI (and not as part of the SPINS/IRI Bundle), to ensure that SPINS is the primary if not sole channel through which the vast majority of NOCPG manufacturers procure IRI data (i.e., to perfect Defendants' market-allocation and price-fixing agreements), IRI prices its standalone data at two to three times the price at which it can be purchased as part of the SPINS/IRI Bundle.

14.     The intended result is to make buying IRI data directly from IRI economically irrational for most customers who instead buy the SPINS/IRI Bundle. For example, over eighty percent of Crownalytics's customers for analytics services buy the SPINS/IRI Bundle. Another ten percent purchase SPINS data alone.

15.     At first, the focus of Defendants' SPINS/IRI Bundle seemed to be the elimination of competition between themselves in the NOCPG Data Market, as well as raising barriers to other

data rivals (Nielsen) thereby harming competition and customers in this NOCPG Data Market.

16.    But in 2019, Defendants began using their market power in the Data Market to ultimately take over the Data Analytics Market as well. To that end, in March 2019, SPINS and IRI announced an expansion of their conspiracy, including the offering of what they labeled "advanced analytics solutions."

17.    Although they called their analytics "advanced," the reality is that the 2019 offering of analytic capability from SPINS for use with IRI data was underwhelming. Customers— since they still had the choice—continued to use Crownalytics and other third-party analytics providers based on the combinations of pricing and quality.

18.    Rather than compete on the merits, in 2021, SPINS and IRI agreed to take things a step further, using their Data Market power in a new way: to foreclose Crownalytics and others from competing with them in the Data Analytics Market, and coerce their data customers to use Defendants' analytic solutions.  In doing so, of course, Defendants also would (and did) increase prices and lower quality to customers in the Data Analytics Market.

19.    To accomplish their anticompetitive scheme, Defendants coordinated to simultaneously alter their prior business practices of many years to: (a) prohibit all of their NOCPG manufacturing customers who buy Defendants' data from doing business with Crownalytics (and other third-party analytics providers) in the Data Analytics Market; (b) prohibit these same customers from purchasing stand-alone software from Crownalytics to self-analyze Defendants' data; and (c) condition the sale of Defendants' NOCPG data—both the SPINS/IRI Bundle and each of their data sets separately—on the manufacturers' agreement either not to use other firms that compete with Defendants in the Data Analytics Market or to buy Defendants' data analytics services in that market.

20.    Remarkedly SPINS admitted it was not acting alone in its efforts to exclude

5

independent analytics providers.  To the contrary, SPINS ultimately admitted in a 2022 letter to Crownalytics that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." This reflects the reality that, as the main distributor of IRI's data, SPINS would have needed IRI's approval before it could impose conditions on the purchase of IRI data via the SPINS/IRI Bundle.

21.     This conduct violates Sections 1 and 2 of the Sherman Act as: (a) a group boycott of Crownalytics—a *per se* violation of Section 1 of the Sherman Act; (b) illegal tying in violation of Sections 1 and 2 of the Sherman Act; and (c) a conspiracy to monopolize in violation of Section 2 of the Sherman Act. This conduct also violates the Colorado Antitrust Act.

22.     To advance Defendants' anticompetitive scheme, SPINS has promoted and sold SPINS PowerTabs tools and services, in breach of a contract with Crownalytics by which it specifically agreed that SPINS may not use Crownalytics's confidential information and reports as a basis to develop or have a third party develop an Excel-based report substantially similar to Crownalytics data analytics reports. Instead, SPINS used Crownalytics's confidential information and reports to create SPINS's substantially similar Excel-based PowerTabs tools and services.

## IV.    THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

23.     To analyze the conduct alleged, there are two relevant product markets: the NOCPG Data Market and the NOCPG Data Analytics Market. The geographic scope of both these markets is national.

### A.    The Relevant Product Markets

#### 1.    The NOCPG Data Market

24.     In the NOCPG Data Market, three providers collect and sell retail tracking data from various retail channels that are relevant to NOCPG manufacturers. These data are stored in databases that the providers maintain. Access to and use of these data are then sold to NOCPG manufacturers. Defendants IRI and SPIN have developed massive databases that are highly

relevant to NOCPG customers. SPINS and IRI are competitors in the NOCPG Data Market.

25.     IRI's data include point-of-sale transactions from large grocery chains and retail outlets. SPINS's data is an exclusive collection of point-of-sale transactions from more specialized, often regional, natural and organic retailers.

26.     A third data collection company is The Nielsen Company, LLC (Nielsen). Like IRI, Nielsen also collects data from retail channels. Customers in the NOCPG Data Market appear to consider Nielsen's data set a third-place choice when compared to either SPINS's or IRI's data. It is unclear whether this is because of the relevance of the retailers from whom Nielsen collects data, or because of the effectiveness of IRI and SPINS's anticompetitive conduct.

27.     Customers in the NOCPG Data Market are manufacturers of NOCPG. To identify and obtain the best advertising, sales channels, and other opportunities necessary to launch and sell NOCPG, these customers look to historical data relating to sales of both their own and other NOCPG. As noted, these data are collected at the point-of-sale from sales channels ranging from large grocery chains (such as Kroger and Walmart) to more specialized and often regional natural and organic retailers and sales channels.

28.     Both SPINS and IRI offer their data as a standalone product. But rather than competing, they coordinate the sale of their data via the SPINS/IRI Bundle. The price for the IRI data as part of the SPINS/IRI Bundle is significantly (two to three times) lower than the price IRI charges for the identical data on a standalone basis, rendering it economically irrational for nearly all data customers to buy the IRI data separately from IRI. Indeed, the pricing is strategic, as it serves to support Defendants' conspiracy and not any efficiencies delivered to the market. Importantly, SPINS does not identify which data are SPINS's data and which data come from IRI in the SPINS/IRI Bundle—although on its website and elsewhere SPINS promotes the fact that the SPINS/IRI Bundle includes IRI data.

29.     Replication of either the SPINS or IRI database, let alone the SPINS/IRI Bundle, is impossible due to, among other factors, exclusive contracts and relationships that SPINS and IRI have taken years to establish and cement with retail channels. As SPINS explains on its website, the SPINS/IRI Bundle is "the industry's only source of cross-channel visibility across the full market landscape." SPINS then explains why: "through exclusive retail partnerships, SPINS is the only place to access point of sale data from hundreds of leading natural, regional, and specialty retailers where emerging trends are often seen first."[1]

30.     Along with exclusive agreements, the time and cost of replicating these data sets is prohibitive. In a complaint that IRI filed against Nielsen in 1997 alleging monopolization of the retail tracking data market, IRI described the barriers to entering that market, which still exist:

> 34. The cost of entering a retail tracking services market, whether using audit-based or scanner-based technology is high. In order to offer its InfoScan service in the United States, for example, IRI had to first create an enormous database of sales and "causel" data measuring consumer purchases at thousands of retail outlets throughout the country. IRI also had to employ hundreds of computer technicians, software engineers, field personnel and client service staff, construct a computer processing facility, and develop complicated computer software systems. IRI then had to develop the expertise to organize, process, and manipulate the vast amounts of scanner data involved in providing a national retail tracking service.

> 35. Moreover, before IRI could begin offering a competitive retail tracking service, it had to accumulate at least 12 to 18 months of data for comparative purposes so that clients could measure trends and changes affecting sales of their products. Stated differently, a supplier typically has to collect and process data for a year-and-a-half before it is in a position to be able to generate revenues and compete effectively in a market for retail tracking services.[2]

31.     Indeed, IRI's complaint explains in detail "the high barriers to entry that characterize these markets" (referring to the broader consumer packaged goods marketplace).[3]

---

1.      *See* https://www.spins.com/insights-and-tools-for-brands/ (last visited on May 30, 2023).
2.      *See Information Resources, Inc. v. The Dun & Bradstreet Corp., et al.*, First Amended Complaint ¶¶ 34-35, Dkt. 1-1.
3.      *Id.* ¶ 95.

These include a long history of industry concentration; high costs to enter the market and also to compete in the market after entry, including those related to developing and maintaining proprietary software systems and "unique expertise"; the long period—twelve to eighteen months—that data must cover before they can be used to identify trends or changes in marketplace behavior; the costs to collect large amounts of data often enough to be useful to customers as well as the costs to store these data and deliver them to customers.[4] According to IRI, "[b]ecause of the high costs associated with providing a retail tracking service, upon information and belief, at a minimum, an efficient supplier must have a share of between 35% and 40% of the United States Market just to break even or achieve a minimum viable scale."[5]

32.     NOCPG manufacturers determine individually which databases include the data most relevant to their business plans. Nearly all customers in the NOCPG Data Market (over eighty percent) buy the SPINS/IRI Bundle.

33.     Accordingly, both SPINS and IRI, individually, have market power in the NOCPG Data Market. Additionally, when acting in concert, the two together possess even more significant market power in the NOCPG Data Market.

**2.      The Data Analytics Market**

34.     After purchasing data in the NOCPG Data Market, NOCPG manufacturers must then analyze those data to identify various market attributes that will help them optimize their sales and marketing strategies. The value of the data lies not in the data themselves, but, rather, in the conclusions to be drawn from them by using data analytics services. Likewise, there is no value to data analytics services without a data set on which to perform them. Crownalytics is one provider of these data analytics services and, until these recent anticompetitive actions by Defendants drove

---

4.      *Id.* ¶¶ 123-127.
5.      *Id.* ¶ 128.

them from the market, the most aggressive among the competitors in terms of the price and value of its services.

35.    The Data Analytics Market is the market in which NOCPG manufacturers obtain data analytics services. The suppliers include experienced third-party data analytics services firms with specific expertise in analyzing point-of-sale data—provided by IRI and SPINS and, to a lesser extent, Nielsen. The data from Nielsen are not interchangeable with the data from IRI and SPINS. That is, many customers or potential customers require data from SPINS and/or IRI and analytics services for that respective data. The customers are manufacturers of NOCPG who retain providers of data analytics services to help them optimize their sales and marketing strategies.

36.    Before the exclusionary conduct that is the basis for this complaint, most customers in the NOCPG marketplace relied entirely on third-party data analytics services providers (like Crownalytics) to analyze the NOCPG data.

37.    Because of the significant associated costs, self-provisioning is not a viable alternative to third-party provisioning of data analytics for most NOCPG data analytics customers. For most of these customers, it would not make business sense to attempt to analyze NOCPG data on their own or to invest in developing the capability to do so. (To place this in perspective, the average charge from Crownalytics for analytics services for a year was only $20,000.) Third-party data analytics providers like Crownalytics permitted these customers to avoid the costs associated with hiring and retaining in-house data analytics experts and the investment necessary to stay current with analytics tools and expertise. Certain large, sophisticated NOCPG manufacturer customers may perform *some* data analysis themselves, using "in-house" professionals, but even most of these customers still purchase data analytics services from third parties to supplement their internal data analytics.

38.    These NOCPG manufacturers that purchase analytics services in the Data

Analytics Market are all customers in the NOCPG Data Market.

39.    Third-party data analytics providers are largely database agnostic, analyzing whatever data their customers provide to them, regardless of the source. Indeed, one reason a customer purchases third-party data analytics services is to harmonize data obtained from multiple sources.

40.    While both IRI and SPINS also offer data analytics services to NOCPG manufacturers (and in part because of that), they have always understood that their customers retain third-party data analytics firms to analyze the data that IRI and SPINS sell to them. IRI and SPINS are also aware of the identities of these data analytics services providers and, until the events giving rise to the complaint, facilitated their access to the data purchased from SPINS and IRI by NOCPG manufacturers. In fact, on various occasions, SPINS has sent emails thanking Crownalytics for promoting SPINS's database to new and existing mutual customers—of SPINS in the NOCPG Data Market and of Crownalytics in the Data Analytics Market. IRI likewise facilitated Crownalytics access to IRI data for customers who bought IRI data.

41.    Crownalytics entered the Data Analytics Market in 2016. By 2020, there existed at least four independent competitors—along with SPINS and IRI—in the Data Analytics Market. These included Crownalytics, TABS Analytics, Red Fox Analytics, LLC ("Red Fox"), and Bedrock Analytics ("Bedrock").

42.    While IRI provides some data analytics services directly, it appears to have allocated at least some portion of that business to its competitor and co-conspirator SPINS. Before IRI and SPINS undertook their anticompetitive scheme, Bedrock and Crownalytics served most customers in the previously competitive Data Analytics Market.

43.    Although other entities provide data analytics services to other types of manufacturing customers, those suppliers are outside the Data Analytics Market because they lack

11

the requisite reputation and experience in the NOCPG space within the consumer-packaged goods industry to compete effectively with data analytics services providers like Crownalytics, who have mainly catered to customers in this space for years. But even were these potential entrants inclined to enter this market, Defendants' conduct has erected barriers to competition by *any* unaffiliated data analytics firm, whether a prior incumbent or new entrant. Defendants' conduct forecloses current and potential competitors equally.

44.     Since the filing of the original complaint, Crownalytics has received notice after notice from customers expressing with regret that Defendants' conduct requires them to terminate their relationships with Crownalytics and move to the more expensive analytic services offered by SPINS. Plaintiff's primary independent competitors are having similar experiences. Through this conduct, SPINS has amassed substantial power in the Data Analytics Market. Upon information and belief, SPINS's market share in the Data Analytics Market now exceeds sixty percent and that share continues to grow as the full effects of Defendants' exclusionary conduct takes hold.

**B.      The Relevant Geographic Markets**

45.     The relevant geographic scope of both the NOCPG Data Market and the Data Analytics Market is national.

46.     Because of differences between countries in consumer demand, language, currency, customer, brand names, bar codes, and advertising, among others, the NOCPG Data Market is national in coverage.

47.     Because data analytics services are designed to factor in and assess these same country-specific variables, the Data Analytics Market also is national.

48.     While a supplier of either service could be located anywhere in the world, expanding the relevant geographic market to global does not affect this case. An international data provider would still need access to relevant US retail tracking data and would encounter the same

barriers discussed herein as a company based in the United States. Similarly, an international provider of analytics services would be just as foreclosed from entering the data analytics market by Defendants' anticompetitive conduct as a US-based provider.

## V.    GENERAL ALLEGATIONS

### A.    Crownalytics's Relationship with SPINS and IRI

49.    When Crownalytics began providing data analytics services in 2016, its customers provided it with access to the data they had purchased from SPINS, IRI, and Nielsen for Crownalytics to analyze.

50.    SPINS knew that Crownalytics was providing these data analytics services to their mutual customers. Indeed, SPINS facilitated this arrangement by providing Crownalytics with access credentials for its databases so that Crownalytics could directly access the data that their mutual customers had purchased.

51.    IRI likewise facilitated Crownalytics's provision of data analytics services to their mutual customers. In fact, IRI regularly provided Crownalytics access credentials to its data so that Crownalytics could serve a particular customer. For example, as late as January 2021, IRI sent Crownalytics credentials and IRI's secure URL so that Crownalytics could access IRI data and conduct analytics services for their mutual customer, Johnsonville Sausage. Specifically, IRI wrote: "Kris, Enclosed, please find your ID & PW for IRI Unify. We recommend using Chrome as your browser, and saving your PW in its settings." IRI personnel also contacted Crownalytics to set up training for its Unify System.

52.    Before 2021, it did not appear that Defendants' anticompetitive activities were outwardly focused at Crownalytics or the Data Analytics Market. In fact, during that time, Crownalytics had an extremely collaborative relationship and worked well with both IRI and SPINS. For example, in an email to Crownalytics dated September 2, 2020, SPINS representative

Anubhav Goel said, "Hope this note finds you and yours doing well. I heard you're building a strong partnership with Brent Grube, one of our newest Sales leaders also based in the Denver area. He's quickly becoming a big fan of yours." Similarly, Crownalytics and IRI worked well together to serve their mutual customers.

**B.** **Then, Things Change**

53.     In mid-2021, both IRI and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases (the data purchased by their customers)—contrary to the prior practices of both companies.

54.     In April 2021, SPINS's Mr. Pavlenkov introduced Mr. Crown to Edricco Reina, who he explained would be responsible for managing SPINS's relationship with independent analytics companies going forward. When Mr. Crown met with Mr. Reina, Mr. Reina informed Mr. Crown that SPINS was working on yet another new "partnership model" for independent data analytics services providers. But he provided no other details at that time.

55.     Three weeks later, while Mr. Crown was waiting for SPINS's Mr. Reina to provide those details, Crownalytics heard from IRI.

56.     On May 5, 2021, Crownalytics received a cease-and-desist letter from IRI (hereafter, the "Cease & Desist") demanding that Crownalytics immediately discontinue all use of IRI's data—which their mutual customers had purchased—and destroy all copies of those data, including any work product developed through their use. This letter arrived without any warning or preceding discussion and took Crownalytics (and its customers) entirely by surprise.

57.     Crownalytics responded to the Cease & Desist, informing IRI that it had not engaged in any of the wrongdoing alleged in that letter (indeed, had not engaged in any wrongdoing at all). Crownalytics nevertheless agreed to take the steps requested by IRI to

discontinue use of the data which their mutual customers had bought from IRI. Crownalytics complied with IRI's demands, despite the significant cost to Crownalytics of doing so, hoping to preserve the possibility of resolving this sudden, inexplicable, and fabricated, conflict.

58.    Crownalytics was advised by other data analytics providers that they had received similar demands from SPINS or IRI, including both Bedrock and Red Fox.

59.    A month later, in June 2021, while Crownalytics and IRI continued their discussion of the Cease & Desist, Mr. Crown received an email from SPINS's Mr. Reina, indicating that he now was prepared to discuss the "new partnership model" to which he had referred in April. Perhaps recognizing that IRI and SPINS's coordinated and simultaneous cessation of business relationships and practices relating to independent data analytics providers— that had been in place for years—might be a bit obvious, SPINS took a different tack than IRI: SPINS labeled its cease-and-desist demand a "new partnership model."

60.    The new model that Mr. Reina revealed was anything but a partnership. To the contrary, SPINS was taking the same action as IRI. Like IRI, going forward, SPINS would reverse its prior practices and now prohibit third-party data analytics services providers from accessing SPINS's database in conjunction with those providers' analysis of data that their customers had procured from SPINS.  Not surprisingly, SPINS later admitted to Crownalytics that its decision to cut off independent analytic providers was driven by its agreements and relationship with IRI. SPINS conceded that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." SPINS also acknowledged that "SPINS understands that IRI has sent a cease and desist letter" to Crownalytics regarding its "use of [IRI] data," and noted that SPINS was acting to preserve the "trust" that IRI "ha[s] placed in us."

61.    During a subsequent call on July 1, 2021, Mr. Reina explained to Mr. Crown that, going forward, customers purchasing data from SPINS for analysis by independent data analytics

services providers would only be permitted to buy static "extracts" of those data to share with their chosen data analytics provider. Not only would these new extracts include inferior data, they would add significant costs to the use of third-party analytics firms, making it too expensive for a manufacturer customer for analytics services to use a competing analytics company.

62.    Under SPINS's new "partnership" plan, NOCPG manufacturers would now only be permitted to provide their retained independent data analytics services providers incomplete, static extracts of data purchased from SPINS, rather than providing the complete access on which the Data Analytics Market was premised. These extracts' inferiority to the data previously available renders the output of the analyses of the extracts correspondingly inferior and unacceptable to data analytics firms' manufacturer customers.

63.    Indeed, the extracts available to non-SPINS data analytics providers are useless for purposes of the services that Crownalytics (and other data analytics services providers) performs. The extracts' limited utility precludes data analytics services providers from generating the type of reporting their customers need and completely defeats the purpose for which customers hire a third-party data analytics services provider like Crownalytics—which was exactly the effect Defendants intended.

64.    Further, NOCPG customers would now have to pay $5,000 for each extract, on top of the costs they already incurred to buy the data from SPINS. Given that a NOCPG manufacturer could require from four to twenty extracts under SPINS's new "partnership" plan annually, the manufacturer customers are now looking at what can fairly be characterized as a $20,000 to $100,000 tax on substantially inferior data and thus substantially inferior data analytics outputs. To place the degree of this tax in perspective, Crownalytics's average annual charges for its data analytics services were $20,000, demonstrating the sham nature of this nonviable

alternative offering.[6] In other words, with SPINS new "partnership" program, its data customers could no longer practically use independent data analytics companies.

65.     Now, only customers who agree to use SPINS's data analytics services—and not use those of a third party—could avoid this degradation in data access and increase in data analysis cost.

66.     Although SPINS and IRI had offered data analytics services before Defendants' new anticompetitive plan, in that previously competitive market environment, neither had gained a significant share of the Data Analytics Market. That is because SPINS and IRI have not offered services that are attractive enough to customers in price and quality to effectively compete against third-party analytics providers on the merits. The only way they could build market share—and ultimately market power—in the Data Analytics Market was through their anticompetitive conduct. And that is what they did.

67.     As if the effect and intent of this effort to foreclose the Data Analytics Market were not obvious enough, Mr. Reina explained it to Crownalytics: third-party data analytics services providers would not survive. And even more specifically, Mr. Reina stated that he "did not know how they would exist in the future."

68.     This statement would have been nonsensical unless Mr. Reina knew that the plan was a concerted effort between IRI and SPINS. Absent SPINS's and IRI's agreement to the plan, it was in both SPINS's and IRI's independent economic interest to cater to customers' desire to use third-party analytics services. And absent their conspiracy, that is what IRI would have done upon learning of SPINS's plan (and vice versa)—because it would mean customers would flock

---

6.     Additionally, SPINS now precludes data analytics providers from harmonizing SPINS's data with data Crownalytics's customers may have purchased from Nielsen. While this restriction appears targeted at Nielsen, it also further undermines the value of independent analytics providers. Previously, NOCPG data customers have benefited from data harmonization because the analyses used all the data available to the customer.

to IRI (or, vice versa, customers would flock to SPINS). Except neither SPINS nor IRI would act in their independent economic self-interest when they could instead obtain the fruits of their concerted effort. Mr. Reina betrayed his knowledge of all this when he predicted the future with such confidence. And his prediction was, of course, accurate.

C.    **The Anticompetitive Consequences for Crownalytics and Others in the Data Analytics Market**

69.    While SPINS's anticompetitive "partnership" plan was not yet fully in effect, SPINS immediately began using it as the anticompetitive weapon it was. SPINS began actively sharing the new plan with customers as well as advising them of the impact this new plan would have on the continuing viability of Crownalytics (and other independent analytics providers) as well as the manufacturer customers' use of third-party analytics services. Among the actions taken by SPINS:

- In November 2021, Crownalytics's remaining customers began reporting that SPINS was telling them that Crownalytics is not authorized to access any SPINS data, even though SPINS's new anticompetitive partnership plan would not be fully effective until May 31, 2022.

- Customers also reported that SPINS was falsely disparaging Crownalytics and recommending an alternative data analytics provider, Red Fox, in the event they did not wish to use SPINS. (Red Fox, previously one of the smaller independent data analytics services providers, appears to have reached an undisclosed agreement with SPINS and IRI. Even assuming that Red Fox did not simply join IRI and SPINS's conspiracy, Red Fox's agreement with SPINS neutralizes

Red Fox's ability and incentive to act as a bona fide independent competitor—disciplining either pricing or quality—of IRI or SPINS in the Data Analytics Market. Red Fox will not be stepping into the low-cost, high-quality maverick role from which Crownalytics was being driven out.)

70.    As expected, Crownalytics's customers began to complain about SPINS's new pricing and data restrictions almost immediately. Crownalytics was repeatedly advised by customers that they had no choice but to drop Crownalytics and move their analytics business to the higher-priced services offered by SPINS. Potential new customers opted not to retain or even inquire with Crownalytics at all.

71.    In a desperate attempt to mitigate its damages in the face of this bald abuse of market power, Crownalytics began to offer customers self-service software tools that did not require Crownalytics to access any data. Rather, the customers would buy the software, enter their data, and analyze the data without Crownalytics's involvement.

72.    Offering this software which permitted customers to replicate at least some of the aspects of Crownalytics's services seemed to address the concerns of some customers, at least temporarily, but many others simply stopped working with Crownalytics.

73.    Yet in a coup de grace, and again without even a colorable excuse, SPINS began advising its customers in the NOCPG Data Market that they are prohibited from using Crownalytics's self-service software to analyze the data they had purchased from SPINS.

74.    This confirms that the claim that SPINS and IRI were protecting intellectual property was pretextual, because as soon as Crownalytics offered customers an alternative third-party data analytics solution that did **not** involve customers providing access to data they bought from SPINS and/or IRI to third-party providers, SPINS moved to prevent them from using that

solution, as well.

75.     The use of pretext as a business rationale in communications with other actors in the marketplace is, like other efforts designed to conceal a conspiracy, a common indicia of conspiracy.

76.     On April 5, 2022, Crownalytics received an official Notice of Termination from SPINS, formalizing and completing SPINS's exclusion of Crownalytics from the marketplace in a manner identical to what IRI had done. This notice terminated any still-existing third-party agreements between SPINS and its customers that permitted Crownalytics to access SPINS's data to provide data analytics services to those customers—effective May 31, 2022.

77.     Right after sending the Notice of Termination, SPINS informed Crownalytics's current, past, and potential customers that, "as of June 1, 2022, Crownalytics will no longer have access to any data from SPINS . . . . If you use Crownalytics with SPINS data, you will need to obtain a new analytics solution."

78.     After receiving the notice from SPINS, Crownalytics's remaining customers told Crownalytics that they had no choice but to terminate their agreements with Crownalytics because Crownalytics was no longer able to provide the valuable data analytics services that customers sought. Customers expressed their disappointment at losing Crownalytics's services, as well as their frustration with the fact that they had no choice but to use SPINS's analytics services.

**DEFENDANTS' UNLAWFUL AGREEMENTS**

79.     Defendants have agreed to combine their product offerings and efforts to stifle competition in both the NOCPG Data and Data Analytics Markets.

80.     For years, SPINS and IRI were two of the three firms competing in the NOCPG Data Market. But that changed when they agreed to stop competing with one another and have one of them—SPINS—serve as the distributor for both companies' NOCPG data products. SPINS did

this by bundling the two products into the SPINS/IRI Bundle. The SPINS/IRI Bundle quickly became the dominant data source in the NOCPG Data Market, with most customers in the market buying it, and with all, or nearly all, analytics providers using that data to perform analytics services. This is an illegal price-fixing and market-allocation agreement between competitors.

81.     But Defendants were not satisfied with simply dominating the Data Market. Instead, in 2019, they decided to expand their illegal agreement and arrangement into the Data Analytics Market.

82.     Thus, in March 2019, SPINS and IRI announced an agreement to move beyond simply bundling their data offerings to expand their price-fixing and market-allocation arrangement into the Data Analytics Market as well. Defendants explained that they would now offer a joint solution that would include "advanced analytics solutions."

83.     Defendants' agreement to extend their power into the Data Analytics Market was particularly welcome news for SPINS, which stood to be the primary beneficiary on that front. Indeed, SPINS noted that it was "pleased to expand our partnership with IRI," presumably because, under the agreement, SPINS was being positioned to emerge as the dominant provider of data analytics services in the market. It appears that an aspect of Defendants' agreement was that they would jointly force customers to SPINS—and not IRI—for data analytics services.

84.     Yet this joint effort did not go as they had hoped, as most customers continued to hire third-party analytics providers, such as Crownalytics, for data analytics services, rather than moving to SPINS. This should not have been surprising, given that customers viewed SPINS's analytics services as lower quality and higher priced. So in 2021, Defendants agreed to and began using their market power in the Data Market to coerce customers away from their preferred analytics providers.

85.     In 2021, SPINS and IRI agreed to directly wield their significant and growing

power against their competitors in the Data Analytics Market and as part of that agreement, as discussed, both began moving to exclude third-party analytics providers, including Crownalytics.

86.    Between April and June 2021, SPINS, the main distributor of both SPINS and IRI data, informed Crownalytics of the new requirements to be imposed on third-party data analytics providers. So onerous were these requirements that it made it impossible for Crownalytics to acquiesce. And, indeed, that was Defendants' intent, with SPINS's Mr. Reina remarking how third-party analytics providers such as Crownalytics could not "exist in the future."

87.    Simultaneously, in May 2021, IRI also moved to bar Crownalytics, demanding that Crownalytics discontinue its use of IRI's data—including that purchased from SPINS through the SPINS/IRI Bundle, as well as IRI's standalone data.

88.    Defendants' joint efforts culminated on April 5, 2022, when SPINS's general counsel sent a letter to Crownalytics providing notice of its "termination" of Crownalytics and decision to bar Crownalytics from accessing either SPINS or IRI data. This letter confirmed that SPINS's conduct was not simply and coincidentally parallel with IRI's but was, instead, part of their joint efforts to exclude competition.

89.    Indeed, in its April 2022 letter, SPINS remarkably admitted it was "not alone" in acting to exclude Crownalytics from the market. To the contrary, Defendants had agreed to jointly take those steps. SPINS conceded that IRI "directed SPINS not to provide IRI data to Kris [Crown] or Crownalytics." SPINS also openly acknowledged that it was communicating with IRI about their efforts to exclude Crownalytics, referencing IRI's cease and desist letter and referenced the bond of "trust" between the two competitors. SPINS's letter confirms that IRI and SPINS were not merely consistently communicating with one another, but they were communicating specifically about implementing their scheme and providing one another assurances of common action. Even putting aside this evidence that SPINS and IRI were communicating about the boycott

of Crownalytics, the fact that SPINS delivered the termination letter on behalf of the products of both competitors is direct evidence of their conspiracy to lead a group boycott against Crownalytics, which also extended to other third-party analytics companies. That is, these two independent economic entities that compete in the same markets expressly undertook the penultimate anticompetitive act together. They were holding hands as they kicked horizontal competitors out of the market.

90.      SPINS's letter continued: "We are working with our clients to transition any services that Crownalytics previously provided and to that end the [third-party agreements] will terminate at the end of May." And SPINS made clear that the goal was to compel customers to move their data analytics needs away from Crownalytics and other third-party analytics providers.

91.      SPINS ultimately severed Crownalytics from its customers and the marketplace through a "termination" that occurred on June 1, 2022, and, both Defendants have since prohibited customers from using Crownalytics to conduct analytics services, often over the protests of customers who would have preferred to continue working with Crownalytics.

92.      Crownalytics was not the only analytics provider to be cut off from its customers by SPINS and IRI during this period. Crownalytics understands that at least Bedrock and TABS have been cut off from their customers, and that no third party is providing analytics services to customers independently from the concerted effort of SPINS and IRI.

## VI.    **HARM TO COMPETITION**

93.      Since Defendants' coordinated conduct began, Crownalytics has received many notices from its customers indicating that they had no choice but to surrender their data analytics services needs to SPINS.

94.      Aside from being coerced to use a data analytics services provider not of their choosing, customers also expressed dissatisfaction to Crownalytics that the prices that SPINS had

begun to charge for data analytics services are much higher than Crownalytics's prices were. Additionally, the quality of their analytics services, as well as their relationship management and customer support, are inadequate.

95.    Defendants have wielded their market power in the NOCPG Data Market to limit customers' choices in the Data Analytics Market to only one: SPINS. In other words, Defendants can, and do, now force NOCPG manufacturers to buy their captive data analytics services as a condition of purchasing access to their essential databases.

96.    Without Defendants' coercive conduct in the NOCPG Data Market, customers would otherwise have contracted with other data analytics services providers in the Data Analytics Market, such as Crownalytics. This is true for many reasons, including that these other data analytics services providers have historically offered superior services at better prices than Defendants now offer. As noted, before the new SPINS "partnership" plan, SPINS's analytics offerings never managed to capture a significant share of the Data Analytics Market in the five years of its existence.

97.    Defendants' actions, collectively and individually, have lessened competition in the Data Analytics Market by limiting consumer choice, increasing prices of the affected services and offerings, and reducing the quality of those outputs. Before the complained-of conduct, there were four independent Data Analytics providers, along with SPINS and IRI, from whom customers could choose—and benefit from the competition on pricing and service quality. Now, Defendants' actions have led to exit from, and consolidation within, the Data Analytics Market leaving customers with only Defendants as their choices for data analytics services.

98.    Defendants' actions, collectively and individually, have lessened competition in the Data Analytics Market by reducing quality of output by eliminating even the possibility of competitive pressure from competing providers of data analytics services (if any non-captive data

analytics services firms choose to remain in the market). Because those would-be competitors' customers are forced to use inferior data to obtain their services, the utility and quality of any data analytics output would be significantly degraded. Accordingly, the overall quality of the data analytics services provided in the Data Analytics Market is diminished and, in essence, destroyed because the analysis depends on access to robust data.

99.    Defendants' actions, collectively and individually, have also lessened competition in the Data Analytics Market by removing any price constraints that previously resulted from the existence of independent competition with a meaningful market share. Crownalytics acquired its position in this market by offering high-quality service at low prices. To the extent that any competition can remain in the face of SPINS and IRI's anticompetitive actions, these competitors will be offering a substantively inferior, higher-priced data analytics services solution. They will be unable to prevent Defendants from imposing supracompetitive pricing because Defendants know that their customers cannot switch to a substitute.

100.    Moreover, Defendants' actions have erected an effective barrier to new entry into the Data Analytics Market because no potential entrant would have the necessary access to Defendants' data sets or be able to independently replicate them (which would require entry into the NOCPG Data Market, which Defendants have also impeded), and access to these data sets is essential to entering and competing in the Data Analytics Market.

## VII.    CROWNALYTICS'S ANTITRUST INJURY AND STANDING

101.    As explained above, Defendants' anticompetitive and unlawful conduct has reduced competition in the Data Analytics Market by eliminating consumer choice, so that the market is limited only to Defendants' own captive data analytics offerings.

102.    Defendants' anticompetitive and unlawful conduct has harmed competition in the Data Analytics Market by reducing quality (and stifling innovation) insofar as Crownalytics, which

offers a superior, differentiated product, is no longer able to offer its product to customers in the Data Analytics Market. Moreover, Defendants' conduct reduces the incentive to innovate in the Data Analytics Market due to Defendants' absolute foreclosure of competition in this market.

103.    Since Defendants have effectively excluded all competitors in the Data Analytics Market, there is no remaining supplier who can restrain SPINS from further increasing its prices.[7] By vanquishing competition in the Data Analytics Market Defendants are able and do sell inferior services in that market for higher prices than would exist if Defendants had not engaged in the anticompetitive conduct described in this complaint to foreclose competition in that market. Indeed, Defendants specifically intended this market foreclosure as shown by SPINS's Mr. Reina statements to Crownalytics that as a result of Defendants' actions, third-party analytics companies like Crownalytics would not exist in that market in the future.

104.    There is no procompetitive justification for the behavior alleged above, all of which unreasonably restrained trade and decreased competition in the Data Analytics Market. Even if any procompetitive business objectives exist, any such objectives could have been achieved by less restrictive means than eliminating all competition.

105.    The same anticompetitive and unlawful conduct described above that has caused this harm to competition in the Data Analytics Market, has harmed Crownalytics's business. As a direct result of Defendants' unlawful acts, Crownalytics has lost customers, will lose its remaining customers, and is effectively precluded from capturing new customers. When the final restraints on Crownalytics's access to data became effective, on June 1, 2022, Crownalytics was completely excluded from the marketplace. This harm confers antitrust standing upon Crownalytics to rectify the antitrust injury that Defendants have caused.

---

7.    Because of its relationship with SPINS, Red Fox no longer provides a competitive restraint. Presumably, Defendants' conduct will stifle all other remaining competitors shortly, to the extent it has not already done so.

**FIRST CLAIM FOR RELIEF**
**(Group Boycott – *Per Se* Violation of Sherman Act, 15 U.S.C. § 1 – Against All
Defendants)**

106.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if
fully set forth herein.

107.    Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market.
Individually, and together, they also are competing suppliers in the Data Analytics Market where
they also compete with Crownalytics, among others.

108.    No other entity collects the NOCPG purchase data that SPINS obtains from smaller
or regional retailers. Nor could another company replicate that database or create a viable substitute
due to a combination of entry barriers including cost, timing, and existing exclusive arrangements.
Because of this unique product offering, SPINS has market power in the NOCPG Data Market.

109.    Because IRI and SPINS have combined their competitive offerings into the
SPINS/IRI Bundle, IRI benefits from SPINS's market power, and SPINS benefits from the
incremental increase in market power driven by the SPINS/IRI Bundle.

110.    Both SPINS and IRI compete against Crownalytics (and other independent data
analytics services providers) in the Data Analytics Market—both individually and as part of their
anticompetitive arrangement.

111.    To provide data analytics services and thereby compete in the Data Analytics
Market, providers such as Crownalytics must have access to the data their customers purchase in
the NOCPG Data Market. Having previously made their data sets available to all providers in the
Data Analytics Market, IRI and SPINS now supply their data sets only along with their own data
analytics offerings.

112.    IRI and SPINS began withholding Crownalytics's (and other competitors') access
to their data, in a departure from past practices that had been mutually beneficial to IRI and SPINS

and data analytics providers, including to Crownalytics, suddenly and contemporaneously. They did so under an agreement to use their shared market power in the NOCPG Data Market to eliminate competition in the Data Analytics Market.

113.    IRI and SPINS make no effort to conceal their anticompetitive conspiracy—in fact they advertise it. IRI and SPINS advertise that they have bundled their previously competing data products and are coordinating their previously competing data analytics offerings. Regardless of the legality of those arrangements, they can hardly now plausibly claim that a major decision impacting the value of that very data bundle as well as their analytics offerings businesses was anything but an agreement to destroy competition from competing independent analytics companies.

114.    Consistent with these admissions, both companies—within weeks of each other—terminated business practices involving complex interdependent relationships with Crownalytics (and others) that had been in place for years and on which the entire Data Analytics Market depends. Deciding to cut off its customers' access to independent analytics providers that served most Data Analytics Market customers is not something that can be done on a whim, given the symbiotic relationship between providers in the NOCPG Data Market and the Data Analytics Market—the services of either one being worth less without the other's.

115.    Because access to SPINS and IRI's data is necessary to provide data analytics services, Defendants' denying Crownalytics access to their data sets prevents Crownalytics from competing in the Data Analytics Market. Moreover, this prevents customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

116.    Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities

of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

117.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider of higher-quality services in the Data Analytics Market.

118.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this complaint.

119.    There is no reason that is not pretextual why either IRI or SPINS would seek to exclude Crownalytics and other competitors from the Data Analytics Market other than the desire to serve that market unrestrained by competition.

120.    Indeed, barring Crownalytics from competing in the Data Analytics Market is the only reason IRI or SPINS would preclude Crownalytics's access to their data. And IRI and SPINS agreed to do so exclusively for this purpose.

121.    Even if there were another purpose, one that was legitimate and procompetitive, animating IRI and SPINS's agreement, that purpose could have been achieved through less restrictive means.

122.    Because Defendants IRI and SPINS are horizontal competitors in the NOCPG Data Market who share market power in that market (and also horizontal competitors of each other and Crownalytics in the Data Analytics Market), their conspiracy is *per se* illegal under the Sherman Act.

123.    Alternatively, Defendants' conduct is unlawful under an inherently suspect, quick-look, or rule-of-reason analysis because the anticompetitive effects substantially outweigh any

legitimate procompetitive benefits of their agreement.

124.    Defendants have thus violated Section 1 of the Sherman Act.

125.    As a result of the foregoing, Crownalytics has been damaged in an amount to be
determined at trial.

### SECOND CLAIM FOR RELIEF
**(Tying – Violation of Sherman Act, 15 U.S.C. §§ 1, 2 – Against All Defendants)**

126.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if
fully set forth herein.

127.    Defendants IRI and SPINS collect retail tracking data, which they sell to
customers—manufacturers of branded NOCPG—in the NOCPG Data Market.

128.    Crownalytics, Defendants SPINS and IRI, and others (at least before Defendants'
anticompetitive conduct) provide data analytics services to those same customers in the Data
Analytics Market.

129.    The NOCPG Data Market and the Data Analytics Market are separate markets
involving separate products and services. NOCPG manufacturers want—and historically had—the
freedom to buy those separate products and services from different suppliers.

130.    SPINS and IRI agreed with each other only to sell their data in the NOCPG Data
Market to customers who also retained SPINS to provide data analytics services in the Data
Analytics Market.

131.    Defendants coerced customers into contracts that contain *de facto* provisions which
operate as negative tying arrangements by conditioning the purchase and use of data on an
agreement not to buy or use the services of Crownalytics (and other competitors in the Data
Analytics Market). Defendants have sent cease and desist letters telling customers that they cannot
provide access to any third parties such as Crownalytics, except in the limited, pretextual manner
described above. If NOCPG manufacturers desire data analytics services, they now must turn to

SPINS.

132.    Because of their necessary and irreplicable data sets, as well as their large market shares, IRI and SPINS have market power in the NOCPG Data Market.

133.    The NOCPG Data Market has high barriers to entry. Not only would entry require a major capital investment, it also would require real-time and ongoing access to retail data for which Defendants have exclusive contracts. There are no realistic alternatives to which NOCPG manufacturers can turn.

134.    Defendants are able to impose these tying arrangements on customers because they have market power in the NOCPG Data Market and are assured that they will not face new entry, nor will any other circumstance reduce their market power in the foreseeable future.

135.    The negative tie affects a substantial volume of interstate commerce in the Data Analytics Market by restricting Crownalytics and other rivals from competing in the market. Defendants' anticompetitive conduct affects interstate commerce because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

136.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

137.    Crownalytics's business reputation and customer relationships have also been damaged by Defendants' actions as described throughout this complaint.

138.    There are no legitimate or procompetitive business reasons for these acts other than

to eliminate competitors in the Data Analytics Market.

139.    Defendants have thus violated Sections 1 and 2 of the Sherman Act.

140.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Conspiracy to Monopolize – Violation of Sherman Act, 15 U.S.C. § 2 – Against All Defendants)

141.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142.    Defendants IRI and SPINS are horizontal competitors in both relevant markets: the NOCPG Data Market and the Data Analytics Market. Through their partnership in the NOCPG Data Market, Defendants derived the opportunity to conspire to monopolize the Data Analytics Market.

143.    Because IRI and SPINS have combined their competitive offerings in the NOCPG Data Market into the SPINS/IRI Bundle, IRI benefits from SPINS's market power, and SPINS benefits from the incremental increase in market power driven by the SPINS/IRI Bundle. But those benefits were not enough for Defendants. SPINS and IRI saw the opportunity to eliminate all competition in the Data Analytics Market.

144.    Defendants agreed to bar Crownalytics and other rivals from accessing their data solely to monopolize the Data Analytics Market.

145.    As discussed above, Defendants terminated business practices and complex interdependent relationships with Crownalytics (and others) that had been in place for years and on which the entire Data Analytics Market depends.

146.    Because access to SPINS and IRI's data is necessary to the provision of data analytics services, Defendants' denying Crownalytics access to their data sets prevents

Crownalytics from being able to compete in the Data Analytics Market. Moreover, this prevents customers in the Data Analytics Market from benefiting from the competition that previously existed in that market, which provided them with more, better choices and lower prices.

147.    Defendants' anticompetitive conduct affects interstate commerce in the Data Analytics Market because Defendants, directly and indirectly, use the means and instrumentalities of interstate commerce, including by offering their products and services to customers throughout the United States and in furtherance of the acts and communications alleged herein.

148.    Crownalytics has suffered injury as a direct result of Defendants' competition-reducing conduct, and the harm to competition flows from that injury: its exclusion from the market results in loss of customers and revenue for Crownalytics and reduced choice and increased prices and lower quality for consumers—in particular, the elimination of customers' ability to choose a low-cost provider in the Data Analytics Market.

149.    There are no legitimate or procompetitive business reasons for these acts other than to eliminate competitors in the Data Analytics Market.

150.    Defendants have thus violated Section 2 of the Sherman Act.

151.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Group Boycott and Concerted Refusal to Deal – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 – Against All Defendants)**

152.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    As alleged herein, Defendants' group boycott and concerted refusal to deal constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

154.    As a result of the foregoing, Crownalytics has been damaged in an amount to be

determined at trial.

## FIFTH CLAIM FOR RELIEF

**(Tying – Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104 – Against All Defendants)**

155.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156.    Defendants' tying arrangements, as alleged herein, constitute illegal restraints of trade in violation of Colo. Rev. Stat. § 6-4-104.

157.    As a result of the foregoing, Crownalytics has been damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
**(Breach of Contract – Against SPINS)**

158.    Crownalytics realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

159.    SPINS and Crownalytics entered into a consulting agreement effective June 29, 2017, by which Crownalytics would provide Consultant Reports and Services to certain clients that SPINS designates ("Agreement"). Paragraph 8 of the Agreement sets forth SPINS's agreement to protect Crownalytics's intellectual property:

> 8. Intellectual Property. SPINS will not offer or provide the Consultant Reports to any other SPINS client other than Designated Clients. SPINS acknowledges that the Consultant Reports and other deliverables that Consultant develops in connection with this Agreement (collectively, the "Work Product") are and will be the Consultant's sole property. SPINS may make suggestions to Consultant with respect to the Consultant Reports and will not assert any proprietary rights to such suggestions against Consultant. SPINS obtains no rights by license or otherwise in the Work Product, except that Consultant hereby grants SPINS a non-exclusive, non-sublicensable limited license solely for the purpose of making the Consultant Reports available to Designated Clients. ***SPINS may not use Consultant's Confidential Information that is a part of the Consultant Reports as a basis on which to develop or have a third party develop an Excel report that is substantially similar to the Consultant Reports. SPINS' breach of***

*this agreement may cause irreparable harm to the Consultant and monetary damages may not be a sufficient remedy for an unauthorized disclosure, usage, sharing or selling of the Consultant Reports. If SPINS discloses the Consultant Reports in violation of this Agreement, Consultant may, without waiving any other rights or remedies and without posting a bond or other security, seek an injunction, specific performance, or other equitable remedy to prevent further disclosure, and may pursue other legal remedies.*

160.    The Agreement has not been formally terminated, but in any event, under paragraph 15g of the Agreement, paragraph 8 survives its termination.

161.    Crownalytics performed under the Agreement by providing to SPINS and the Designated Clients its Confidential Information and Consultant Reports, including its Sales Planning Tools and its Strategic and Sales Planning Services.

162.    Crownalytics's principal place of business is Colorado. It entered the Agreement with SPINS in Colorado, and it performed its obligations under the Agreement in Colorado.

163.    SPINS understood that Crownalytics was located in Colorado. When SPINS communicated with Crownalytics, it directed those communications to Colorado. And when SPINS wrongfully terminated the Agreement, it sent its termination notice to Crownalytics's address in Colorado, and Crownalytics felt the harm of SPINS's wrongful termination in Colorado.

164.    In or about February 2021, SPINS launched a new Excel-based tool called PowerTabs.

165.    SPINS used Crownalytics's Confidential Information, Consultant Reports, Sales Planning Tools, and Strategic and Sales Planning Services Reports as a basis to develop or have a third party develop PowerTabs in breach of its contractual obligations.

166.    SPINS's PowerTabs is substantially similar to, indeed in certain material respects identical to, Crownalytics's Excel-based data analytics tools.

167.    SPINS advertises PowerTabs on its website and markets PowerTabs as a competitive alternative to Crownalytics's Data Analytics Services.

168.    As a result of the foregoing, SPINS has breached paragraph 8 of the Agreement.

169.    Upon information and belief, SPINS has provided Data Analytics Services using PowerTabs in partnership with DAAP and/or IRI.

170.    As a result of the foregoing, Crownalytics has been damaged and irreparably harmed.

171.    As a result of the foregoing, Crownalytics is entitled to injunctive relief.

172.    As a result of the foregoing, Crownalytics is entitled to damages in an amount to be determined at trial.

## VIII.   RELIEF REQUESTED

WHEREFORE, Crownalytics demands judgment in its favor, and against Defendants, plus the following additional relief:

A.    An injunction as to all Claims and as requested herein;

B.    Damages in an amount to be proven at trial;

C.    Treble damages on Crownalytics's antitrust claims;

D.    Reasonable attorneys' fees and costs;

E.    Pre- and post-judgment interest at the highest allowable legal rates; and

F.    Such other and further relief as the Court deems just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  May 30, 2023               BONA LAW PC

                                   *s/Luke Hasskamp*
                                   Luke Hasskamp
                                   Kristen Harris
                                   4275 Executive Square, Suite 200
                                   La Jolla, CA 92037
                                   luke.hasskamp@bonalawpc.com
                                   kristen.harris@bonalawpc.com

858 964-4589

Pat Pascarella
100 Crescent Court, #700-3425
Dallas, TX 75201
pat.pascarella@bonalawpc.com
469 296-7716

Aaron Gott
331 Second Ave S., Suite 420
Minneapolis, MN 55401
aaron.gott@bonalawpc.com
612 284-5001

LAW OFFICE OF RICK
 D. BAILEY, ESQ
Rick D. Bailey, Esq.
1801 Broadway, Ste. 528
Denver, CO 80202
rick@rickbaileylaw.com
Tel. 720 676-6023

COUNSEL FOR PLAINTIFF

Plaintiff's Address: 9455 Crystal Lane, Longmont, CO 80503.

## CERTIFICATE OF SERVICE

The undersigned certifies that he served all counsel of record electronically with a copy of

**FIRST AMENDED COMPLAINT AND JURY DEMAND** using the Court's CM/ECF

electronic filing system.

<u>*s/Luke Hasskamp*</u>
Luke Hasskamp
