**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01275-NYW-JPO

CROWNALYTICS, LLC,

     Plaintiff,

v.

SPINS LLC,
DAAP, LLC, and
CIRCANA, LLC,

     Defendants.

---

## ORDER ON MOTIONS TO DISMISS

---

This matter is before the Court on Defendant SPINS LLC's and DAAP LLC's Motion to Dismiss Plaintiff's First, Third, and Fourth Claims in Its First Amended Complaint [Doc. 114] and Defendant [Circana, LLC's] Motion to Dismiss First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. 115]. The Court has reviewed the Motions, the related briefing, and the applicable case law. For the reasons explained below, the Motions to Dismiss are respectfully **DENIED**.

### BACKGROUND

The Court draws the following facts from the First Amended Complaint and Jury Demand (the "First Amended Complaint"), [Doc. 92], and presumes they are true for purposes of this Order. This case revolves around data and data analytics in the natural and organic consumer packaged goods ("NOCPG") market. [*Id.* at ¶ 4]. In the NOCPG data market, providers collect and sell retail tracking data from various retail channels.

[*Id.* at ¶ 24].  Defendants SPINS LLC; DAAP, LLC (together, "SPINS");[1] and Circana, LLC ("Circana")[2] are competitors in the NOCPG data market and have each "developed massive databases that are highly relevant to NOCPG customers."  [*Id.* at ¶¶ 5–7, 24]. There are only "three providers" in the NOCPG data market—SPINS, Circana, and The Nielsen Company ("Nielsen"), a non-party to this action.  [*Id.* at ¶¶ 24, 26].

Both SPINS and Circana offer their data as a standalone product, but "rather than competing, they coordinate the sale of their data" by offering it in a bundle (the "Bundle"). [*Id.* at ¶ 28].  Replication of SPINS's or Circana's data, or the Bundle, is not possible due to the exclusive contracts and relationships that SPINS and Circana have established with various retail channels.  [*Id.* at ¶ 29].   Replication of these data sets is also cost-prohibitive.  [*Id.* at ¶ 30].  The Bundle quickly became the "dominant data source" in the data market, as most customers buy the Bundle and "all, or nearly all" data analytics providers use that data to perform analytics services.  [*Id.* at ¶ 80].  SPINS and Circana "share market power" in the data market.  [*Id.* at ¶ 122].

In the NOCPG data *analytics* market, NOCPG manufacturers "obtain data analytics services" from suppliers who use the data provided by Circana, SPINS, and Nielsen.  [*Id.* at ¶ 35].  Plaintiff Crownalytics, LLC ("Plaintiff" or "Crownalytics") is a "data-agnostic analytics and insights consulting company" that provided data analytics services since it entered the market in 2016.  [*Id.* at ¶¶ 4, 34, 41].  Crownalytics's analytics services

---

[1] DAAP, LLC is a subsidiary of SPINS LLC.  [Doc. 92 at ¶¶ 5–6].  These entities refer to themselves collectively as SPINS, *see, e.g.*, [Doc. 114], and the Court does the same.

[2] On  March 6, 2024, Defendant Information Resources, Inc. ("IRI") filed an Unopposed Motion to Amend Case Caption and Party Name, indicating that it had legally changed its name to Circana, Inc.  [Doc. 157].  The Court granted that motion.  [Doc. 158].  The Court construes all references to IRI contained in the filings in this case as references to Circana.

included analyzing data its customers purchased from SPINS, Circana, and Nielsen.  [*Id.* at ¶ 49].  After it first entered the market, Crownalytics "had an extremely collaborative relationship" with both SPINS and Circana.  [*Id.* at ¶ 52].  In 2019, SPINS and Circana entered the data analytics market.  [*Id.* at ¶¶ 81–83]; *see also* [*id.* at ¶ 42 ("While [Circana] provides some data analytics services directly, it appears to have allocated at least some portion of that business to . . . SPINS.")].  However, SPINS and Circana "always understood" that their customers retained third-party data analytics firms to analyze the data purchased from them, and they previously facilitated the third-party firms' access to that data.  [*Id.* at ¶ 40].  By 2020, there were "at least four independent competitors" aside from SPINS and Circana in the data analytics market—Crownalytics and non-parties TABS Analytics, Red Fox Analytics, and Bedrock Analytics.  [*Id.* at ¶ 41].

Then, in 2021, "both [Circana] and SPINS suddenly and simultaneously moved to restrict third-party data analytics services providers'—including Crownalytics's—access to their databases (the data purchased by their customers)," which was contrary to their established practices.  [*Id.* at ¶ 53]; *see also* [*id.* at ¶¶ 54–68].  Specifically, on May 5, 2021, Circana sent Crownalytics a cease-and-desist letter demanding that Crownalytics immediately discontinue all use of Circana (then-IRI) data.  [*Id.* at ¶ 56].  Other providers, such as Bedrock Analytics and Red Fox Analytics, told Plaintiff that they received similar demands from SPINS or Circana.  [*Id.* at ¶ 58].  Around the same time, in April 2021, SPINS informed Crownalytics that it was "working on" a new "partnership model" for third-party analytics providers.  [*Id.* at ¶ 54].  SPINS provided more detail about this "partnership model" in June 2021, explaining that customers who purchased data from SPINS, but who planned to engage third-party data firms to analyze the data, "would only be

permitted to buy static 'extracts' of th[e] data to share with their chosen data analytics provider." [*Id.* at ¶¶ 59, 61]. The extracts would not only have inferior data, rendering them "useless," but they would also increase costs for any customers planning to use third-party analytics providers. [*Id.* at ¶¶ 61, 63]. Only customers who agreed to use *SPINS's* analytics services could "avoid this degradation in data access and increase in data analysis cost. " [*Id.* at ¶ 65]. SPINS later admitted that "its decision to cut off independent analytic providers was driven by its agreements and relationship with [Circana]." [*Id.* at ¶ 60].

As a result of this alleged anticompetitive conduct, customers advised Crownalytics that "they had no choice but to drop Crownalytics and move their analytics business to the higher-priced services offered by SPINS." [*Id.* at ¶ 70]. Other potential customers opted "not to retain or even inquire with Crownalytics at all." [*Id.*]. Crownalytics subsequently began to offer its customers self-service tools that did not require Crownalytics to directly access the data purchased by its customers, but SPINS prohibited its customers from using that software. [*Id.* at ¶¶ 71, 73]. Effective May 31, 2022, SPINS formally terminated any existing agreements that permitted its customers to use Crownalytics's services to access SPINS's data, [*id.* at ¶ 76], and both SPINS and Circana have prohibited customers from using Crownalytics to conduct analytics services, over customer protests, [*id.* at ¶ 91]. According to Plaintiff, non-parties Bedrock Analytics and TABS Analytics have been "cut off from their customers," too. [*Id.* at ¶ 92].

Plaintiff alleges that Defendants' collective and individual actions have reduced competition in the data analytics market by limiting consumer choice, increasing prices,

and reducing the quality of services.   [*Id.* at ¶ 97].   Crownalytics alleges that it was "completely excluded from the marketplace" as of June 1, 2022.  [*Id.* at ¶ 105].

Crownalytics initiated this civil action on May 23, 2022 against SPINS and Circana. *See generally* [Doc. 1].  Plaintiff asserted ten claims in its original Complaint:  (1) a group boycott claim under § 1 of the Sherman Act against all Defendants; (2) a unilateral refusal to deal claim under § 2 of the Sherman Act against SPINS; (3) a unilateral refusal to deal claim under § 2 of the Sherman Act against Circana; (4) a tying claim under §§ 1 and 2 of the Sherman Act against all Defendants; (5) a conspiracy to monopolize claim under § 2 of the Sherman Act against all Defendants; (6) a group boycott and concerted refusal to deal claim under the Colorado Antitrust Act ("CAA") against all Defendants; (7) a unilateral refusal to deal claim under the CAA against SPINS and Circana; (8) a tying claim under the CAA against all Defendants; (9) a claim for tortious interference with existing and prospective business relationships against SPINS; and (10) a breach of contract claim against SPINS.  *See* [Doc. 1 at ¶¶ 88–194].

After one round of motions to dismiss, only three claims remained—Plaintiff's tying claims and the breach of contract claim.  [Doc. 86 at 28].  However, in dismissing the other claims, the Court sua sponte granted Plaintiff leave to file an amended pleading, only with respect to the group boycott and conspiracy to monopolize claims, finding that "the issues in the case [were] close."  [*Id.* at 27].  Plaintiff subsequently filed the First Amended Complaint, which asserts six claims:  (1) a group boycott claim under § 1 of the Sherman Act against all Defendants ("Claim One"); (2) a tying claim under §§ 1 and 2 of the Sherman Act against all Defendants ("Claim Two"); (3) a conspiracy to monopolize claim under § 2 of the Sherman Act against all Defendants ("Claim Three"); (4) a group

boycott and concerted refusal to deal claim under the CAA against all Defendants ("Claim Four"); (5) a tying claim under the CAA against all Defendants ("Claim Five"); and (6) a breach of contract claim against SPINS ("Claim Six").  [Doc. 92 at ¶¶ 106–72].

SPINS and Circana separately move to dismiss Claims One, Three, and Four. [Doc. 114]; *see also* [Doc. 115 at 6 (arguing that "Plaintiff's [First Amended Complaint] does not remedy the defects with its group boycott and conspiracy-to-monopolize claims.")].[3]  Plaintiff filed a consolidated Response in opposition, *see* [Doc. 120], and Defendants have filed reply briefs, [Doc. 123; Doc. 124].  A few months later, Plaintiff moved to amend the First Amended Complaint, [Doc. 141], which Defendants oppose, [Doc. 152; Doc. 153].  The Court turns to the pending Motions below.

## LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).  The plaintiff may not rely on conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (plausibility

---

[3] When referencing docket entries, the Court cites to the page numbers generated by the Case Management/Electronic Court Files ("CM/ECF") system rather than the page numbers assigned by the Parties.

refers "to the scope of the allegations in a complaint" and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible").

**ANALYSIS**

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations," 15 U.S.C. § 1, and section 2 renders it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States," *id.* § 2; *see also* Colo. Rev. Stat. §§ 6-4-104, 6-4-105 (similar CAA provisions).[4]

**I.      Unlawful Agreement**

Defendants first contend that Plaintiff fails to plausibly allege the existence of an unlawful agreement, which is required to state both a group boycott claim under § 1 and a conspiracy claim under § 2.   *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017) (to plead a § 1 claim, the plaintiff must allege

---

[4] Claim Four is brought under the CAA, not the Sherman Act.  [Doc. 92 at ¶¶ 152–57]. The Court recognized in its prior Order that "[t]he Colorado Antitrust Act is the state law analogue to the Sherman Act," and "[b]ecause federal antitrust law principles apply to both the federal and state antitrust claims, both claims may be analyzed together." *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1262–63 (D. Colo. 2015) (citing *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009)); *see also* [Doc. 86 at 8].  As the Parties recognize, *see* [Doc. 120 at 35; Doc. 123 at 20–21; Doc. 124 at 19], the CAA was amended after the Court's Order last year and no longer states that "[i]t is the intent of the general assembly that, in construing [the CAA], the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws." *Compare* Colo. Rev. Stat. § 6-4-119 (1992) (former § 6-4-119, relating to interpretation, repealed 2023), *with* Colo. Rev. Stat. § 6-4-119 (2023) (relating to statutes of limitations).  Although the Parties raise truncated arguments about the amendment's effect on Plaintiff's CAA claim in this case, the Court need not resolve these arguments due to the Court's conclusion that the Motions to Dismiss, which do not raise separate arguments specifically directed at Claim Four, should be denied.

(1) "the existence of an agreement or conspiracy between two or more competitors to restrain trade," and (2) that the restraint is unreasonable); *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1205 (D. Colo. 2019) ("To plead a claim for conspiracy to monopolize" under § 2, "a plaintiff must allege: (1) an agreement among two or more people to monopolize a relevant market; (2) overt acts done in furtherance of that agreement; (3) a specific intent to obtain monopoly power; and (4) an appreciable effect on commerce."). "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (cleaned up). At the pleading stage, a plausible claim "requires . . . enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

A plaintiff can show an unlawful agreement through direct or circumstantial evidence. *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083–85 (10th Cir. 2006). Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* at 1083 (quotation omitted); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 n.24 (10th Cir. 2019) ("Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement."). However, because "[t]he absence of direct evidence is common in antitrust claims, especially at the motion-to-dismiss stage, . . . claims can [also] survive solely on circumstantial evidence," *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, No. 2:22-cv-00251-MIS-DLM, 2024 WL 1051322, at *12

(D.N.M. Mar. 11, 2024), i.e., evidence that "require[s] inferences to show that an anti-competitive agreement exists," *Llacua*, 930 F.3d at 1174 n.24.

Defendants argue that the First Amended Complaint lacks allegations amounting to either direct or circumstantial evidence of an unlawful agreement between them. [Doc. 114 at 10–19; Doc. 115 at 9–20]. Crownalytics disagrees, arguing that it has sufficiently alleged facts amounting to direct evidence of an unlawful agreement. [Doc. 120 at 9–22]. It also contends that although it need not rely on circumstantial evidence, it can satisfy its burden at the pleading stage through circumstantial evidence, too. [*Id.* at 22–27].

### A.    Direct Evidence

Plaintiff argues first that it has adequately pleaded that SPINS and Circana entered into an unlawful agreement through direct evidence, relying on the following:

- In 2014,[5] SPINS and Circana started offering their data for purchase in the Bundle, [Doc. 92 at ¶¶ 12, 19, 28];

- In 2019, Defendants announced that they would enter the analytics market and "would now offer a joint solution that would include 'advanced analytics solutions,'" which SPINS noted was an "expan[sion of its] partnership with [Circana]," [*id.* at ¶¶ 82–83];

- In April 2022, SPINS informed Crownalytics that Crownalytics would no longer be permitted to use SPINS's data effective June 2022 and that Circana had "directed SPINS not to provide [Circana] data to . . . Crownalytics," [*id.* at ¶¶ 88–89].

---

[5] Plaintiff alleged in the original Complaint that SPINS and Circana began offering the Bundle in 2014. *See* [Doc. 1 at ¶ 26]. The First Amended Complaint omits this date, *see* [Doc. 92 at ¶ 28]; *see also* [Doc. 95-1 at 5, 10], but does not expressly disavow it. Although an amended pleading typically supersedes the original and renders it of no legal effect, *see Bird v. Easton*, 859 F. App'x 299, 302 (10th Cir. 2021), the Court finds the 2014 date relevant to its analysis and considers it here. *See Davis v. Combined Ins.*, No. 3:17-cv-02655-MMC, 2018 WL 10701406, at *1 (N.D. Cal. Mar. 7, 2018) (a plaintiff "cannot omit prior factual allegations in an attempt to state a claim" (quotation omitted)).

*See* [Doc. 120 at 14–15]. Plaintiff argues that these allegations identify direct evidence that "SPINS and [Circana] were jointly engaged in concerted action to bar Crownalytics from the Analytics Market," as they were "acting on each other's behalf, communicating with customers on each other's behalf, and providing assurances to each other of common action as they worked to cut their competitors off at the knees." [*Id.* at 15, 17].

As mentioned above, direct evidence must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Champagne Metals*, 458 F.3d at 1083. The allegations that Plaintiff relies upon, even taken together and construed in Plaintiff's favor, require inferences to arrive at a conclusion that Circana and SPINS unlawfully agreed to restrain trade in the analytics market. *Compare* [Doc. 92], *with In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) (allegations that two executives admitted, on multiple occasions, that there was an agreement to block competitors from accessing data were "textbook examples of adequate direct evidence"); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) ("direct evidence" allegations included allegations that the defendant told its insurer that if it worked with its competitor, it would enter into a provider agreement with the insurer's competitor to reduce the insurer's dominance in the insurance market).

While Plaintiff analogizes its allegations to those in *Champagne Metals*, that case is quite distinguishable from this one. In *Champagne Metals*, the Tenth Circuit concluded that the plaintiff had adequately alleged direct evidence of an agreement where the plaintiff alleged that a representative of one competitor told the representative of another that if it continued to work with the plaintiff company, he and other potential customers would "cause other distributors in that area of the country to source their metals from

other mill sources" and that developing a business relationship with plaintiff "would be putting other business with potential customers at risk." *Champagne Metals*, 458 F.3d at 1083.  In other words, there were allegations of an express agreement "indicat[ing] an agreement among service centers to take collective action" and exclude the plaintiff from the market.  *Id.* at 1083–84.  There are no such allegations here, and the allegations cited by Plaintiff are inadequate to constitute direct evidence of an unlawful agreement.

### B.    Circumstantial Evidence

The failure to adduce direct evidence at the pleading stage is not fatal to Plaintiff's claims; indeed, "[d]irect evidence is rare in an antitrust case, especially at the motion to dismiss stage."  *Brown v. JBS USA Food Co.*, No. 22-cv-02946-PAB-STV, 2023 WL 6294161, at *8 (D. Colo. Sept. 27, 2023).  Plaintiff can also proceed using circumstantial evidence, "such as parallel conduct, to infer conspiracy."  *Othart Dairy Farms*, 2024 WL 1051322, at *12.

"If the complaint does not directly allege an agreement but instead makes only 'allegations of parallel conduct . . . in order to make a § 1 claim, [the allegations of parallel conduct] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"  *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1263 (D. Colo. 2015) (quoting *Twombly*, 550 U.S. at 557 (alterations in original)).  "For a § 1 claim to survive, then, a plaintiff must plead parallel conduct and something 'more,'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 557), i.e., "plus factors," *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013).   "Plus factors" are "economic actions and outcomes that are largely

inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action.'"  *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)).

### 1.    Parallel Conduct

Defendants argue that Plaintiff fails to allege parallel conduct between SPINS and Circana.  [Doc. 114 at 13–14; Doc. 115 at 10–14].  They each insist that the alleged parallel actions—SPINS's and Circana's efforts to preclude Crownalytics (and other third-party providers) from accessing their data for analytics purposes—are not factually similar or temporally proximate and cannot be deemed "parallel."  [Doc. 114 at 14; Doc. 115 at 12, 14].

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"  *SD3, LLC*, 801 F.3d at 427.  "[P]arallel conduct 'need not be exactly simultaneous and identical in order to give rise to an inference of agreement.'"  *Id.* at 429 (quoting *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010)); *see also In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071, 2023 WL 9004806, at *11 (M.D. Tenn. Dec. 28, 2023) (recognizing that "temporal proximity of the parallel conduct is only one factor" courts consider when reviewing a complaint's allegations).

Here, Plaintiff has alleged that (1) before 2021, Defendants allowed (and facilitated) third-party analytics providers' access to their data, [Doc. 92 at ¶¶ 40, 49–51]; (2) in April 2021, SPINS mentioned a new third-party provider "partnership model" to Crownalytics, [*id.* at ¶ 54]; (3) in May 2021, Circana sent Crownalytics a cease-and-desist

letter demanding that Crownalytics discontinue all use of Circana's data, [*id.* at ¶ 56]; (4) in June and July 2021, SPINS informed Crownalytics that its customers who used third-party analytics servicers would be permitted to use only an "extract" of SPINS's data, which meant that "data customers could no longer practically use independent data analytics companies," [*id.* at ¶¶ 60–64]; and (5) in April 2022, SPINS sent Crownalytics a letter indicating that SPINS and Circana had discussed Crownalytics's access to their data, [*id.* at ¶¶ 88–89].

The Court finds that these allegations sufficiently allege that Circana and SPINS acted similarly and engaged in parallel conduct.  While Circana attempts to distinguish between its and SPINS's alleged conduct, *see* [Doc. 115 at 11–12], any minor factual differences in how Defendants allegedly went about excluding Crownalytics or other providers from the analytics market do not undermine Plaintiff's allegations that Circana and SPINS, around the same time, changed their established practices and worked to preclude Crownalytics's access to their data.  *See Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078 (N.D. Ill. 2011) (rejecting the defendants' "exclusive concentration on small details without refuting the bigger picture allegations" (footnote omitted)).  "Courts accept allegations of . . . parallel changes in policies or strategies as evidence of parallel conduct," *In re RealPage, Inc.*, 2023 WL 9004806, at *11, and allegations that Defendants "move[d] in relative lockstep" are not necessary, *SD3, LLC*, 801 F.3d at 428.  This is especially true at the motion to dismiss stage, where the Court must accept Plaintiff's allegations as true and Plaintiff "need not 'offer evidence that tend[s] to rule out the possibility that the defendants were acting independently.'"  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 721 (S.D.N.Y. 2017) (quoting *Starr v.*

*Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (alteration in original)).  Rather, Plaintiff "need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Id.* (quotation omitted).  The Court finds that Plaintiff has met this burden with respect to parallel conduct.

**2.      Plus Factors**

To state a claim under §§ 1 or 2, allegations of parallel conduct, alone, are insufficient.  *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, 111 F. Supp. 3d 1180, 1188 (D. Colo. 2015) (citing *Twombly*, 550 U.S. at 557); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).  "A plaintiff must also allege 'plus factors' which allow a factfinder to infer a conspiracy."  *Brown*, 2023 WL 6294161, at *9.  Plus factors that "tend to demonstrate the existence of an agreement" include things like (1) allegations about the defendants' motives to enter into an unlawful agreement; (2) allegations that the defendants acted contrary to their interests; (3) allegations "implying a traditional conspiracy," *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011), or (4) allegations of "a high level of interfirm communications," *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  These factors, however, are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016); *see also In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of plus factors.").  "Any fact that tends to exclude the possibility of independent action may qualify."  *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1259–60 (S.D. Fla. 2021).

Defendants argue that Plaintiff fails to put forth sufficient allegations of "plus factors" supporting a conspiracy, picking out the plus factors they identify in Plaintiff's First Amended Complaint and explaining why each is insufficient to plausibly support a conspiracy. *See, e.g.*, [Doc. 114 at 16–19; Doc. 115 at 15–20]. However, since "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances," the Court must analyze the sufficiency of the First Amended Complaint by considering it as a whole, rather than zeroing in on each purported plus factor separately. *SD3, LLC*, 801 F.3d at 425; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 797 (N.D. Ill. 2017) (rejecting argument that "isolate[ed] each factor, and [found] instances when courts . . . questioned their weight in determining the plausibility of conspiracy allegations").

Plaintiff relies on the following "plus factors" to argue against dismissal: (1) Defendants "had a clear and rational motive to enter into an unlawful agreement," (2) Defendants acted contrary to their interests in carrying out the alleged conspiracy because "suddenly prohibiting customers from working with their preferred analytics providers and instead forcing them to Defendants' higher priced and lower quality services would seem irrational," (3) Defendants' communications about terminating Crownalytics's access to their data, (4) Defendants' operation in a concentrated market, and (5) Defendants' simultaneous exclusion of Crownalytics after years of cooperating with Crownalytics. [Doc. 120 at 25–26]. Together, and considering Plaintiff's overarching position that Defendants acted in concert to restrain trade in the data analytics market, the Court finds that Plaintiff has adequately alleged something more than just parallel conduct to avoid dismissal at the pleading stage.

First, Plaintiff alleges that Defendants had a motive to conspire because although Defendants entered the data analytics market in 2019, "neither had gained a significant share" of the market, and "[t]he only way they could build market share—and ultimately market power—in the Data Analytics Market was through their anticompetitive conduct." [Doc. 92 at ¶ 66]; *see also* [*id.* at ¶¶ 16, 96].  Furthermore, "[m]otive to conspire may be inferred where the parallel 'action taken [by defendants] had the effect of creating a likelihood of increased profits,'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968)), *aff'd*, 899 F.3d 87 (2d Cir. 2018), and Plaintiff alleges that the effect of Defendants' parallel conduct was that SPINS's market share in the analytics market "now exceeds sixty percent and . . . continues to grow as the full effects of Defendants' exclusionary conduct takes hold," [Doc. 92 at ¶ 44].  While SPINS argues that the economic motives underlying its actions were "independent of any agreement with" Circana, [Doc. 114 at 17], the Court must take all well-pleaded facts as true, and Plaintiff "must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation," *Gelboim*, 823 F.3d at 782.

Plaintiff also raises allegations from which inferences may be drawn that Defendants' simultaneous exclusion of third-party providers was not the result of independent action.  While the fact that SPINS and Circana joined together in 2014 to offer their data in the Bundle does not, in the Court's view, amount to direct evidence of collusion several years later, it remains relevant to the Court's analysis.  Plaintiff alleges that SPINS and Circana individually have market power in the data market, [Doc. 92 at

¶¶ 32–33], and that their market power has enhanced their ability to exclude competition in the data analytics market by requiring their customers to use their own analytics services, [*id.* at ¶¶ 11, 16, 18, 77–78, 84–85, 95]; *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1147 (N.D. Cal. 2009) ("[T]he allegations regarding Defendants' participation and use of joint venture . . . agreements go beyond merely alleging that Defendants' joint ventures . . . simply fostered an 'opportunity' to collude.  To the contrary, Plaintiffs alleged that such agreements were used as the means to maintain and achieve the end result of the conspiracy by controlling the supply, and thereby permitting increases in the price for the products.").  Moreover, SPINS and Circana allegedly communicated about limiting Crownalytics's access to their data.  *See* [Doc. 92 at ¶¶ 88–89]; *see also* [Doc. 115-1 (the April 2022 letter)].[6]   While Defendants contend that their communications were innocent, *see* [Doc. 114 at 18–19; Doc. 115 at 20], these arguments "rel[y] on inferences being drawn in their favor which, of course, is the antithesis of the standard of review applicable to a motion to dismiss." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1145.  Interfirm communications "need not necessarily be conspiratorial communications" to be a relevant consideration, *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018), and "[c]ourts have . . . found that unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business

---

[6] The Court may consider the contents of the April 2022 letter in ruling on the Motions to Dismiss, without converting them to motions for summary judgment, because the letter is referenced in the First Amended Complaint, is central to Plaintiff's claims, and is not subject to dispute as to its authenticity.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

practices, such as new pricing practices," *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010).

The fact that both SPINS and Circana's alleged actions were contrary to their past practices, *see* [Doc. 92 at ¶¶ 49–52], is also a relevant factor for the Court's consideration. Plaintiff alleges that SPINS and Circana previously facilitated their customers' use of Plaintiff's services before simultaneously moving to restrict Plaintiff's access to their data. [*Id.*]. "An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference" of an agreement. *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015). And finally, the fact that the Parties operate in a concentrated market lends support to an inference of an unlawful agreement, as well. *See* [Doc. 92 at ¶¶ 12, 41, 44]; *see also SD3, LLC*, 801 F.3d at 432 ("A market in which sales power is concentrated in the hands of the few can also facilitate coercion."); *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 430 (S.D.N.Y. 2021) ("The fewer the number of participants in the market the easier to reach an agreement to restrain trade and the easier to enforce such an agreement, thus the more plausible the inference of conspiracy.").[7]

---

[7] The Court recognizes that "[o]ligopolies pose a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from" independent parallel behavior, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017), and the fact that Defendants operate in an oligopolistic market "may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism," *Burtch*, 662 F.3d at 227 (quotation omitted). For this reason, in oligopoly cases, "courts require plaintiffs to satisfy certain 'specialized evidentiary standards,' such as evidence that 'tends to exclude' the possibility that defendants acted independently in response to common market stimuli and mutually held incentives." *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023) (quoting *Valspar*, 873 F.3d at 193; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, No. 23-720, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). But the Court cannot impose such

Considering all of these factors together, the Court concludes that Plaintiff has adequately alleged sufficient "plus factors" to give rise to a plausible inference of an unlawful agreement. *Brown*, 2023 WL 6294161, at *12 (concluding that pleading "at least two plus factors" permitted a plaintiff to survive a motion to dismiss). The Motions to Dismiss are **DENIED** to the extent they seek dismissal of Claims One, Three, or Four for failure to allege an unlawful agreement.

## II.   Intent to Monopolize

In the alternative, Circana argues that Plaintiff cannot state a conspiracy to monopolize claim under § 2 of the Sherman Act because it fails to plausibly allege a specific intent to monopolize. *See* [Doc. 115 at 21]; *see also GDHI Mktg.*, 416 F. Supp. 3d at 1205 (conspiracy claim requires, among others, allegations of "a specific intent to obtain monopoly power").

Circana's argument relies exclusively on prior rulings in this case. It notes that then-Magistrate Judge Crews's Recommendation on the earlier motions to dismiss found that the original Complaint had adequately alleged both an unlawful agreement and intent to monopolize, relying on "the same allegations" for each element, [Doc. 115 at 21]; *see also* [Doc. 74 at 11–13, 18–19], and that this Court ultimately disagreed with Judge Crews's conclusion about the sufficiency of the allegations about an unlawful agreement, [Doc. 86 at 9–16]. Circana posits that because this Court previously found Plaintiff's allegations on a *separate element* of the claim insufficient, and because Plaintiff, in

_____

evidentiary requirements at the pleading stage. *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1145 ("While Defendants' assertion that high market concentration was attributable to 'independent decision-making and vigorous competition' ultimately may prove to be valid, the Court cannot resolve this issue on the merits at this juncture.").

Circana's view, "has [not] added any new material to the [First Amended Complaint] that plausibly alleges specific intent," it must follow that dismissal of Claim Three is appropriate for failure to allege a specific intent to monopolize.  [Doc. 115 at 21 (citation omitted)].

Circana's conclusory argument that "[f]or the same reasons that [Plaintiff's] allegations were insufficient for an agreement, . . . they do not show specific intent to monopolize," [*id.* (quotation omitted)], does not convince the Court that dismissal of Claim Three is appropriate.   Circana acknowledges that this Court never passed on the sufficiency of Plaintiff's allegations with respect to intent to monopolize, *see* [*id.*], and Circana does not explain why the Court's prior ruling on a separate issue now forecloses Claim Three; indeed, its Motion to Dismiss does not make any argument about the appropriate legal standards for alleging intent or meaningfully argue why Plaintiff's allegations do not meet those standards, and any attempt by Circana to implicitly incorporate by reference arguments raised in a prior motion is improper.  *See Leathers v. Leathers*, 856 F.3d 729, 751 (10th Cir. 2017) (a court may decline to consider arguments not adequately briefed).  Circana cannot rely on the Court's prior silence on the issue to justify dismissal, especially when the Court has now concluded that the First Amended Complaint adequately alleges the existence of an unlawful agreement.   Accordingly, Circana's Motion to Dismiss is **DENIED**.

## III.   Applying the *Per Se* Rule or the Rule of Reason

Restraints can be unlawful in two ways.  "A small group of restraints," typically "horizontal restraints" (i.e., restraints between competitors) "are unreasonable *per se* because they 'always or almost always tend to restrict competition and decrease output.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (quoting *Bus. Elecs. Corp. v.*

*Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).  "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue."  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (cleaned up).

"Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Am. Express Co.*, 585 U.S. at 541 (quotation omitted).  The rule of reason requires "the finder of fact [to] decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

"*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)), and the *per se* rule is a "demanding standard" that should apply "only in clear cut cases," *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998).  Courts focus on the type of alleged unlawful practice involved to determine which rule to apply.  *Kemp & Assocs.*, 907 F.3d at 1273.

SPINS argues that Plaintiff's Sherman Act claims still fail to meet Rule 12(b)(6) standards because "the well-pleaded facts foreclose any claim under the rule of reason." [Doc. 114 at 20].[8]  SPINS insists that the rule of reason is the appropriate test because

---

[8] In this section of its Motion to Dismiss, SPINS attacks the "group boycott" and "conspiracy" claims generally.  [Doc. 114 at 19].  However, it is unclear to the Court whether the *per se* rule verses rule of reason inquiry even applies to a conspiracy to monopolize claim under § 2.  *See In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 10 n.6 (1st Cir. 2020) (stating that the rule of reason doctrine "developed in the context

(1) the allegations in the First Amended Complaint "yield plausible arguments for procompetitive effects," which it claims renders the *per se* rule in applicable, and (2) the *per se* rule is not appropriate where the restraint is ancillary to the objective of a joint venture, which is what SPINS and Circana have formed.   [Doc. 114 at 20–21]. Crownalytics disagrees, arguing that it has alleged a *per se* violation of the Sherman Act because under Tenth Circuit precedent, group boycotts involving horizontal competitors who cut off access to a supply necessary to enable the excluded firm to complete are *per se* unlawful.  [Doc. 120 at 27].

The Supreme Court has "long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act."  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985). In *Northwest Wholesale Stationers*, it explained that it has generally applied the *per se* approach in cases involving "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle."  *Id.* at 294 (quotation omitted).  The Court identified three common components of these types of cases:  the firm "often cut off access to a supply, facility, or market necessary to enable the boycotted

---

of section 1 claims and is not typically applied to claims under section 2"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1139 (7th Cir. 1983) ("[T]he Rule of Reason does not directly apply as such to the offense of monopolization under section 2 of the Sherman Act."); *see also Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1233 (10th Cir. 2016) (discussing *per se* rule and rule of reason analyses in the context of § 1 claims, but not § 2 claims).  Because the issue is not briefed by the Parties, the Court declines to pass on it.  However, should any Party attempt to revisit this issue later in this case, they will be expected to explain, with supporting authority, whether this analysis applies to Plaintiff's § 2 claim.

firm to compete," the firm had "a dominant position in the relevant market," and the practices "were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* However, "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Id.* at 295. Following *Northwest Wholesale Stationers*, the Tenth Circuit has recognized that "[c]lassic group boycotts involving conspirators whose market position are horizontal to each other and who 'cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete,' are generally *per se* illegal under § 1." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (quoting *Nw. Wholesale Stationers*, 472 U.S. at 294); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) ("A group boycott is another per se violation of section one.").

SPINS nevertheless contends that the rule of reason should apply here. It first argues that "where 'group boycott' allegations yield plausible arguments for procompetitive effects, the *per se* rule is inapplicable." [Doc. 114 at 20 (citing *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *13 (D. Colo. Apr. 7, 2010))]; *see also* [Doc. 123 at 13 (arguing that the "default [rule of reason] framework means that *per se* treatment is inappropriate if the alleged facts reveal 'plausible arguments concerning procompetitive effects' of the alleged restraint")]. This argument misstates the supporting case law. *See Compliance Mktg.*, 2010 WL 1416823, at *13 (recognizing that courts *can* consider in their analyses whether there are plausible arguments about procompetitive effects); *Nw. Wholesale Stationers*, 472 U.S. at 295 (expressly stating that a concerted refusal to deal subject to *per se* treatment "*need not*

*necessarily*" possess a lack of procompetitive effects (emphasis added)).  SPINS's suggestion of a cut-and-dry rule misses the mark; indeed, the Supreme Court has recognized that "[t]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Nw. Wholesale Stationers*, 472 U.S. at 294 (quotation omitted)).  And cases cited by SPINS decided at the summary judgment stage, *e.g.*, *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1204 (10th Cir. 2006); *Pfenninger v. Exempla, Inc.*, 116 F. Supp. 2d 1184, 1193 (D. Colo. 2000), are inapposite to the Court's analysis here, where the Court's primary concern is the sufficiency of the allegations in the Complaint, not SPINS's asserted justifications for its actions.

SPINS also argues that the "Tenth Circuit has recognized that application of the *per se* rule is not appropriate where the restraint is ancillary to the objective of a joint venture."  [Doc. 114 at 21 (quoting *Foreign Trade Corp. v. Otter Products, LLC*, No. 14-cv-03133-RPM, 2017 WL 11686317, at *4 (D. Colo. Feb. 15, 2017))].  The Court disagrees that such a broad rule has been established.  The case relied upon for this proposition, *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994), recognized that joint venture cases should not automatically receive *per se* treatment, and courts instead must "look at the challenged agreement to judge whether it represents the essential reason for the competitors' cooperation or reflects a matter merely ancillary to the venture's operation; whether it has the effect of decreasing output; and whether it affects price."  *Id.* at 964.  It specifically noted that it "did not read the [Supreme] Court's precedent involving joint ventures to imply any special treatment or differing antitrust analysis."  *Id.*  Furthermore, SPINS's argument requires the Court to go beyond the

strictures of a motion to dismiss and construe the allegations in the way *SPINS* would like.  Plaintiff does not allege that any restraint was simply ancillary to Defendants' joint venture; rather, it alleges that Defendants acted with the specific intent to restrain trade and exclude Plaintiff from the market.  [Doc. 92 at ¶¶ 63, 66, 79–85].

Of course, "[n]ot all group boycotts are necessarily *per se* violations" of the Sherman Act.  *Full Draw Prods.*, 182 F.3d at 751 n.4.  What the case law shows is that a determination of the appropriate rule requires a case-specific analysis, rather than reliance on catch-all propositions.  "[T]he decision to apply the *per se* rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output or instead one designed to increase economic efficiency and render markets more, rather than less, competitive," *Gregory*, 448 F.3d at 1203 (quotation omitted), with a focus on whether the defendant "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," had "a dominant position in the relevant market," and undertook actions that are "not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive,"  *Nw. Wholesale Stationers*, 472 U.S. at 294.

Here, Plaintiff alleges that SPINS and Circana "cut off access to a supply . . . necessary to enable [Crownalytics] to compete," *see id.*, by alleging that these companies, having market power in the data market, precluded their customers from using Crownalytics's and other third parties' analytics services, [Doc. 92 at ¶¶ 56, 71–78, 103, 105], and by "erect[ing] barriers to competition by any unaffiliated data analytics firm, whether a prior incumbent or new entrant," [*id.* at ¶ 43].  Plaintiff also claims that at least SPINS has "a dominant position in the relevant market," *Nw. Wholesale Stationers*, 472

U.S. at 294; *see also* [Doc. 92 at ¶ 44]; that Crownalytics "was completely excluded from" the data analytics market on June 1, 2022, [Doc. 92 at ¶ 105]; and that Defendants "have effectively excluded all competitors in the Data Analytics Market, [so] there is no remaining supplier who can restrain SPINS from further increasing its prices," [*id.* at ¶ 103]. And finally, Plaintiff alleges that Defendants' actions were "not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive," *Nw. Wholesale Stationers*, 472 U.S. at 294, by alleging that Defendants' actions have resulted in "reduced choice and increased prices and lower quality for consumers" and "[t]here are no legitimate or procompetitive business reasons for [Defendants'] acts other than to eliminate competitors in the Data Analytics Market," [Doc. 92 at ¶¶ 136, 138]; *see also* [*id.* at ¶¶ 11, 34, 43].

These allegations, taken as true, plausibly allege a restraint that "facially appear[s] to . . . tend to restrict competition and decrease output," *Gregory*, 448 F.3d at 1203, and are sufficient at the pleading stage to allege a *per se* Sherman Act violation. *See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 958, 984 (D. Minn. 2013) (finding similar allegations sufficient at the pleading stage); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 346 (S.D.N.Y. 2021) (same). For this reason, the Court need not consider SPINS's argument about the sufficiency of Plaintiff's allegations under a rule of reason approach, and SPINS's Motion to Dismiss is **DENIED**. The Court's conclusion, however, does not preclude Defendants from arguing later in the proceedings that, based on what is adduced in discovery, the rule of reason should apply. *See PharmacyChecker.com*, 530 F. Supp. 3d at 346.

### IV.      Motion to Amend

On February 5, 2024, Plaintiff filed a Motion for Leave to File Second Amended Complaint, *see* [Doc. 141 (the "Motion to Amend")], which Defendants oppose, [Doc. 151; Doc. 153].  In the Motion to Amend and the corresponding reply brief, [Doc. 161], Plaintiff "recognizes that a denial of Defendants' [Motions to Dismiss] would render [its] motion to amend moot," [*id.* at 2 n.1]; *see also* [Doc. 141 at 7 ("[I]n the event this Court is inclined to deny Defendants' pending motions to dismiss the First Amended Complaint, it would render this motion moot.")].  Based on this representation, and because the Court has denied the Motions to Dismiss, the Motion to Amend is **DENIED** as moot without substantive consideration of the arguments therein.

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)      Defendant SPINS LLC's and DAAP LLC's Motion to Dismiss Plaintiff's First, Third, and Fourth Claims in Its First Amended Complaint [Doc. 114] is **DENIED**;

(2)      Defendant [Circana, LLC's] Motion to Dismiss First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Doc. 115] is **DENIED**;

(3)      The Motion for Leave to File Second Amended Complaint [Doc. 141] is **DENIED as moot**; and

(4)     Within **14 days** of this Order, Defendants shall answer the First Amended

Complaint.


DATED:  May 10, 2024                          BY THE COURT:

Nina Y. Wang
United States District Judge